# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| Jill Rudolph, as Trustee for the Heirs and Next-of-Kin of Abby Rudolph, deceased,<br><br>  Plaintiffs,<br><br>vs.<br><br>MEnD Correctional Care, PLLC, and Michelle Pender, individually and in her capacity as Clay County Jail Nurse, and Clay County, Minnesota, and Julie Savat, individually and in her capacity as Clay County Jail Administrator, and Justin Roberts, individually and in his capacity as Clay County Assistant Jail Administrator, and CO Raynor Blum, CO Nancy Livingood, CO Ashley Johnson, CO Tiffany Larson, CO Deborah Benson, CO Jana Bartness, CO Ryan Magnuson, CO Anastacia Hermes, CO Joel Torkelson, CO Anthony Hanson, CO Amber Nelson, CO Cassie Olson, CO Devin Lien, CO Richard Stetz, CO Brianna Then, CO Amy Rood, and CO Lucas Heck, individually in their capacities as Clay County Correctional Officers, and CO Kari White-Tuton, individually and in her capacity as Clay County Jail Correctional Officer and Clay County Jail Health Tech,<br><br>  Defendants. | **Case No.: 0:18-cv-1020**<br><br><br>**AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |

The above captioned Plaintiff for her causes of action against the above-named

Defendants, states and alleges as follows:

1.

Plaintiff brings this action pursuant to 42 U.S.C. § 1983 for Defendants' violation of Abby Rudolph's federal constitutional rights guaranteed by the Eight and Fourteenth Amendment of the Constitution of the United States, while acting under the color of state law. Plaintiff also brings this action as an action for medical negligence.

## JURISDICTION

2.

This action arises under the United States Constitution, particularly under the provisions of the Fourteenth Amendment, and under federal law, particularly 42 U.S.C. § 1983 of the Civil Rights Act.

3.

This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331, which gives this Court original jurisdiction over civil actions arising under the federal laws and federal constitution, and pursuant to 28 U.S.C. § 1343(a)(3)-(4), which gives this Court original jurisdiction over civil actions to redress the deprivation under color of state law, statute, ordinance, regulation, custom or usage of any federal constitutional right or any right secured by federal statutes including 42 U.S.C. § 1983. This Court has supplemental jurisdiction over plaintiff's state law medical negligence claims pursuant to 28 U.S.C. § 1367.

## VENUE

4.

Venue is proper in the District of Minnesota, as the acts and transactions complained of herein all occurred within this District.

**PARTIES**

5.

At the time of her death, decedent Abby Rudolph was a citizen of the State of Minnesota and was incarcerated in the Clay County, Minnesota, Jail.

6.

Plaintiff Jill Rudolph is the mother of decedent Abby Rudolph and is the Trustee for the Heirs and Next-of-Kin of Abby Rudolph, having been appointed on March 1, 2017 by the district court of Clay County, Minnesota. A copy of the Order appointing Plaintiff Jill Rudolph is attached hereto as Exhibit A.

7.

Defendant MEnD Correctional Care, PLLC ("MEnD") is a limited liability company organized and existing under the laws of the State of Minnesota with its principal place of business at 67 10th Ave South, Waite Park, MN 53687. On information and belief, at all times material herein, MEnD provided health care services at the Clay County, Minnesota Jail.

8.

On information and belief, Defendant MEnD at all times material, had a contract with Defendant Clay County—either directly or indirectly through a third patty health services organization—to provide medical services, including nursing services, at the Clay County, Minnesota Jail. As such, Defendant MEnD and its employees were the agents of Clay County and were acting under color of state law at all times herein

3

material.

9.

Defendant MEnD is liable for the acts and omissions of its employees, including Defendant Nurse Michelle Pender. Defendant MEnD was responsible for the training and supervision of its nurses, including Defendant Nurse Michelle Pender.

10.

Upon Information and belief, Defendant Michelle Pender ("Pender"), was, at all times material herein, employed by Defendant MEnD and was providing nursing and medical services to inmates at the Clay County jail pursuant to her employment with MEnD and pursuant to, on information and belief, a contract between MEnD and Defendant Clay County. As such, Defendant Pender was, at all times material herein, an agent of Clay County and acting under color of state law.  She is being sued in her individual capacity as well as her official capacity as a nurse at the Clay County jail.

11.

Defendant Clay County, Minnesota ("Clay County") is, and at all relevant times was, a political entity charged with the control and supervision of all law enforcement personnel, jail personnel and contractors in the Clay County Jail, including Defendants Michelle Pender, Julie Savat, Justin Roberts, CO Raynor Blum, CO Nancy Livingood, CO Ashley Johnson, CO Tiffany Larson, CO Deborah Benson, CO Jana Bartness, CO Ryan Magnuson, CO Anatacia Hermes, CO Torkelson, CO Anthony Hanson, CO Amber Nelson, CO Cassie Olson, CO Devin Lien, CO Richard Stetz, CO Brianna Then, CO Amy Rood, CO Lucas Heck, and CO/Health Tech Kari White-Tuton.

4

12.

Upon information and belief, Defendant Julie Savat ("Savat") is, and at all relevant times was, the duly appointed and acting Jail Administrator for the Clay County Jail. As such, Defendant Savat was a duly appointed agent authorized to enforce the law and was acting under the color of the law at all times herein material. All causes of action brought against Defendant Savat are brought both individually and in her official capacity as the Jail Administrator of the Clay County Jail.

13.

Upon information and belief, Defendant Justin Roberts ("Roberts") is, and at all relevant times was, the duly appointed and acting Assistant Jail Administrator for the Clay County Jail. As such, Defendant Roberts was a duly appointed agent authorized to enforce the law and was acting under the color of the law at all times herein material. All causes of action brought against Defendant Roberts are brought both individually and in his official capacity as the Assistant Jail Administrator of the Clay County Jail.

14.

Upon information and belief, Defendant CO Raynor Blum ("Blum") is, and at all relevant times was, a duly appointed and acting corrections officer at the Clay County Jail. As such, Defendant Blum was a duly appointed agent authorized to enforce the law and was acting under the color of the law at all times herein material. All causes of action brought against Defendant Blum are brought both individually and in his official capacity as correctional officers.

88630860.1

15.

Upon information and belief, Defendant CO Nancy Livingood ("Livingood") is, and at all relevant times was, a duly appointed and acting corrections officer at the Clay County Jail. As such, Defendant Livingood was a duly appointed agent authorized to enforce the law and was acting under the color of the law at all times herein material. All causes of action brought against Defendant Livingood are brought both individually and in her official capacity as correctional officers.

16.

Upon information and belief, Defendant CO Ashley Johnson ("Johnson") is, and at all relevant times was, a duly appointed and acting corrections officer at the Clay County Jail. As such, Defendant Johnson was a duly appointed agent authorized to enforce the law and was acting under the color of the law at all times herein material. All causes of action brought against Defendant Johnson are brought both individually and in her official capacity as correctional officers.

17.

Upon information and belief, Defendant CO Tiffany Larson ("Larson") is, and at all relevant times was, a duly appointed and acting corrections officer at the Clay County Jail. As such, Defendant Larson was a duly appointed agent authorized to enforce the law and was acting under the color of the law at all times herein material. All causes of action brought against Defendant Larson are brought both individually and in her official capacity as correctional officers.

88630860.1

18.

Upon information and belief, Defendant CO Deborah Benson ("Benson") is, and at all relevant times was, a duly appointed and acting corrections officer at the Clay County Jail. As such, Defendant Benson was a duly appointed agent authorized to enforce the law and was acting under the color of the law at all times herein material. All causes of action brought against Defendant Benson are brought both individually and in her official capacity as correctional officers.

19.

Upon information and belief, Defendant CO Jana Bartness ("Bartness") is, and at all relevant times was, a duly appointed and acting corrections officer at the Clay County Jail. As such, Defendant Bartness was a duly appointed agent authorized to enforce the law and was acting under the color of the law at all times herein material. All causes of action brought against Defendant Bartness are brought both individually and in her official capacity as correctional officers.

20.

Upon information and belief, Defendant CO Ryan Magnuson ("Magnuson") is, and at all relevant times was, a duly appointed and acting corrections officer at the Clay County Jail. As such, Defendant Magnuson was a duly appointed agent authorized to enforce the law and was acting under the color of the law at all times herein material. All causes of action brought against Defendant Magnuson are brought both individually and in his official capacity as correctional officers.

7

21.

Upon information and belief, Defendant CO Anastacia Hermes ("Hermes") is, and at all relevant times was, a duly appointed and acting corrections officer at the Clay County Jail. As such, Defendant Hermes was a duly appointed agent authorized to enforce the law and was acting under the color of the law at all times herein material. All causes of action brought against Defendant Hermes are brought both individually and in her official capacity as correctional officers.

22.

Upon information and belief, Defendant CO Joel Torkelson ("Torkelson") is, and at all relevant times was, a duly appointed and acting corrections officer at the Clay County Jail. As such, Defendant Torkelson was a duly appointed agent authorized to enforce the law and was acting under the color of the law at all times herein material. All causes of action brought against Defendant Torkelson are brought both individually and in his official capacity as correctional officers.

23.

Upon information and belief, Defendant CO Anthony Hanson ("Hanson") is, and at all relevant times was, a duly appointed and acting corrections officer at the Clay County Jail. As such, Defendant Hanson was a duly appointed agent authorized to enforce the law and was acting under the color of the law at all times herein material. All causes of action brought against Defendant Hanson are brought both individually and in his official capacity as correctional officers.

88630860.1

24.

Upon information and belief, Defendant CO Amber Nelson ("Nelson") is, and at all relevant times was, a duly appointed and acting corrections officer at the Clay County Jail. As such, Defendant Nelson was a duly appointed agent authorized to enforce the law and was acting under the color of the law at all times herein material. All causes of action brought against Defendant Nelson are brought both individually and in her official capacity as correctional officers.

25.

Upon information and belief, Defendant CO Cassie Olson ("Olson") is, and at all relevant times was, a duly appointed and acting corrections officer at the Clay County Jail. As such, Defendant Olson was a duly appointed agent authorized to enforce the law and was acting under the color of the law at all times herein material. All causes of action brought against Defendant Olson are brought both individually and in her official capacity as correctional officers.

26.

Upon information and belief, Defendant CO Devin Lien ("Lien") is, and at all relevant times was, a duly appointed and acting corrections officer at the Clay County Jail. As such, Defendant Lien was a duly appointed agent authorized to enforce the law and was acting under the color of the law at all times herein material. All causes of action brought against Defendant Lien are brought both individually and in his official capacity as correctional officers.

27.

Upon information and belief, Defendant CO Richard Stetz ("Stetz") is, and at all relevant times was, a duly appointed and acting corrections officer at the Clay County Jail. As such, Defendant Stetz was a duly appointed agent authorized to enforce the law and was acting under the color of the law at all times herein material. All causes of action brought against Defendant Stetz are brought both individually and in his official capacity as correctional officers.

28.

Upon information and belief, Defendant CO Brianna Then ("Then") is, and at all relevant times was, a duly appointed and acting corrections officer at the Clay County Jail. As such, Defendant Then was a duly appointed agent authorized to enforce the law and was acting under the color of the law at all times herein material. All causes of action brought against Defendant Then are brought both individually and in her official capacity as correctional officers.

29.

Upon information and belief, Defendant CO Amy Rood ("Rood") is, and at all relevant times was, a duly appointed and acting corrections officer at the Clay County Jail. As such, Defendant Rood was a duly appointed agent authorized to enforce the law and was acting under the color of the law at all times herein material. All causes of action brought against Defendant Rood are brought both individually and in her official capacity as correctional officers.

10

30.

Upon information and belief, Defendant CO Lucas Heck ("Heck") is, and at all relevant times was, a duly appointed and acting corrections officer at the Clay County Jail. As such, Defendant heck was a duly appointed agent authorized to enforce the law and was acting under the color of the law at all times herein material. All causes of action brought against Defendant Heck are brought both individually and in his official capacity as correctional officers.

31.

Upon information and belief, Defendant CO Kari White-Tuton ("White-Tuton") is, and at all relevant times was, a duly appointed and acting corrections officer at the Clay County Jail. As such, Defendant White-Tuton was a duly appointed agent authorized to enforce the law and was acting under the color of the law at all times herein material. All causes of action brought against Defendant White-Tuton are brought both individually and in her official capacity as correctional officers.

**FACTUAL BACKGROUND**

32.

Abby Rudolph was nineteen years old when she died. She had been struggling with addiction since she had become hooked on pain medication while recovering from a broken hip she suffered her junior year in high school. Ms. Rudolph's struggle with addiction led to her arrest on the afternoon of October 30, 2016 for shoplifting. She was booked into the Clay County Jail at 5:29 p.m. She had a hypodermic needle cap in her

11

possession.

33.

The following morning, at 10:00 a.m., MEnd nurse, Defendant Michelle Pender, did a medical assessment. Defendant Pender noted that Abby was a heroin user but, based on what Ms. Rudolph told her, noted that her last use was "4 months ago." A drug test was not performed. A MEnd chemical withdrawal flow chart was not used or filled out at that time.

34.

At approximately 7:30 p.m. that evening, Defendant CO Raynor Blum was conducting rounds when a female inmate informed him that she was concerned for Ms. Rudolph because Ms. Rudolph was going though drug withdrawal. This inmate also claimed that Ms. Rudolph had drugs in her jail locker. Because the inmate was "hard to understand," Defendant CO Blum asked that she write down her concerns and told her he would pick them up on his next round.

35.

On his next round, Defendant CO Blum received a note stating that Ms. Rudolph had been experiencing withdrawal symptoms the previous evening and that she had not eaten or drank anything. Defendant Blum turned the note over to Defendant Team Leader Nancy Livingood. Defendant Livingood pulled Ms. Rudolph out of the female block and spoke with her, addressing the concerns of the other females. She reported that Ms. Rudolph indicated that she had "used a little," but, according to Defendant Livingood, "she was fine and she appeared to be doing ok."

36.

The note from Abby Rudolph's fellow inmates also stated that Ms. Rudolph had heroin in her locker, located in her underwear. Defendant Livingood checked Ms. Rudolph's locker and found a clear package in the underwear containing substances. Testing showed that one of the substances was meth. It was believed that the other was heroin, but that needed to be confirmed.

37.

One of the reporting inmates was interviewed on November 9, 2016—after Ms. Rudolph's death. See was never questioned about Ms. Rudolph's condition and behavior at the time the note was given to CO Blum. In the interview, the reporting inmate stated that Ms. Rudolph was fine when she came in on October 30, but on October 31, her condition deteriorated throughout the course of the day. When Ms. Rudolph returned from court on the 31st, the reporting inmate learned that she was a heroin addict who was using approximate ½ gram per usage prior to being incarcerated and, as a result of her incarceration, was in the process of coming off heroin. Soon after, Ms. Rudolph began to become weak. On the evening of October 31, because they were concerned for Ms. Rudolph's health, the inmates wrote the note and gave it to Defendant CO Blum. They asked that Ms. Rudolph be moved and monitored because of her deteriorating condition. Abby was removed at approximately 9:00 p.m. on October 31 and moved to holding cell #3.

38.

At 5:00 a.m. on November 1, Ms. Rudolph informed Defendant CO Johnson that

she could not eat her breakfast. According to jail records, that morning, Ms. Rudolph "puked multiple times and missed the toilet a few times." Defendant CO Larson observed a "green chunky substance, which appeared to be vomit, on the floor next to her mattress." Defendant Larson also observed "various [bodily] fluids throughout the cell," which "had a bad smell." The jail records report that Ms. Rudolph was ill because she "was coming down from drugs."

39.

When Defendant Larson informed Defendant Team Leader Benson of Ms. Rudolph's condition and the condition of her cell, Defendant Benson's gave Ms. Rudolph a bucket and some new clothes and told Ms. Rudolph to clean it up. Ms. Rudolph then showered because she had soiled herself, was given clean underwear, and cleaned up her cell. Defendant Larson then administered a Urine Analysis Test that showed that Ms. Rudolph was positive for THC, Methamphetamine, Opioids, and Amphetamines.

40.

Fourteen hours later, at 7:00 p.m. on November 1, Ms. Rudolph was still ill and still puking. She was also reported to be "talking and not making much sense." As a result, she was moved to the "High Risk" cell at 7:50 p.m. for close observation. According to jail records, "She was placed on a 15-–minute watch due to her detoxing." During the transfer, Ms. Rudolph told Defendant Bartness that she "was detoxing from heroin." The jail's "close watch sheet" indicates Ms. Rudolph was "moved to 'HR'" at "1950," and that she was "Medical – detoxing heroin." At about 9:30 p.m., Ms. Rudolph

14

called to Defendant Hanson. When he responded, he saw vomit in Ms. Rudolph's toilet and found Ms. Rudolph lying on a mat on the floor near the toilet with a towel covering her head and eyes.

41.

At 1:45 a.m. on November 2, Ms. Rudolph asked Defendant CO Magnuson for some Gatorade to help with her withdrawal. CO Magnuson found that there was no Gatorade in the refrigerator and gave Ms. Rudolph nothing. At some point on the morning of November 2, Defendant CO Roberts checked on Ms. Rudolph and found her lying on her mattress, which was on the floor. There was feces in the toilet and soiled underwear lying next to her on the floor. With the assistance of Defendant COs Hermes, they awoke Ms. Rudolph and had her put her soiled materials in a biohazard bag. They then took her to get a shower and cleaned the cell. They discovered that Ms. Rudolph "had [soiled] herself while in bed and found what appeared to be urine on the floor."

42.

After returning to the cell, Ms. Rudolph indicated that she was keeping her mattress on the floor to be close to the toilet in case she needed to vomit. Defendant CO Roberts then spoke to Defendant Nurse Michelle Pender and Defendant Health Tech White-Tuton who informed him that Ms. Rudolph was "going through withdrawals and that a urine analyze [sic] showed positive for Methamphetamine and Opioids." Defendants Pender and White-Tuton told CO Roberts that they had spoken to Ms. Rudolph about drinking fluids and were putting her on a liquid diet.

88630860.1

43.

At 10:00 a.m. on November 2, Ms. Rudolph had a visit with Defendant Nurse
Pender who noted that Ms. Rudolph was "starry eyed @ times." She also noted that
Ms. Rudolph reported being "sick to my stomach." When Defendant Nurse Pender
"encouraged" Ms. Rudolph "to use the toilet instead of being incontinent on the floor,"
Ms. Rudolph responded that, "she did not realize what she was doing." During this
visit, Defendant Nurse Pender, for the first time, filled in the Chemical Withdrawal
Flow Sheet. Ms. Rudolph was given six points for "eating disturbances," but was given
zero points for "orientation" and zero points for hallucinations despite having been
reported to be "talking and not making much sense," and despite admitting to Nurse
Pender that she did not realize she had been incontinent on the floor of her cell. If she
had been property scored, her score would have been in excess of 10 meaning that a
Medical Doctor was to "contacted for further orders." No MD was contacted, and no
treatment was administered.

44.

After dinner on November 2, Defendant CO Nelson was retrieving
Ms. Rudolph's tray when Ms. Rudolph asked her "for a new blue bag for puking." CO
Nelson got a red biohazard bag and brought it to Ms. Rudolph's cell. She asked
Ms. Rudolph to "place her blue bag full of vomit in" and gave her a "new blue puke
bag." At some point later in the evening, Defendant CO Bartness asked Defendant CO
Heck to once again "give Ms. Rudolph a new puke bag." CO Heck went to the high-risk

cell where Ms. Rudolph handed him "her current puke bag," and Defendant Bartness

gave Ms. Rudolph a fresh bag. Defendant Heck dumped the full puke bag in the toilet

in the high-risk cell and "noticed that the puke was liquid, dark brown, and appeared to

have small black speckles."

45.

On November 3 at 12:30 a.m., Defendant CO Olson gave Ms. Rudolph a half

bottle of Gatorade, a glass of water, and a yet another new "puke bag." CO Olson

observed Ms. Rudolph "sit up and squat next to the toilet and dump the old bag out."

Thus, based on the CO reports, Ms. Rudolph filled at least three blue puke bags and

also puked on the floor multiple times between 7:50 p.m. on November 1 and 12:30 a.m.

on November 3. Just one and one-half hours later, at 2:00 a.m., the close watch sheets

indicate that another unidentified CO gave Ms. Rudolph "water, new vomit bag." Just

two and one-half hours later, at 4:34 a.m., Defendant CO Olson gave Ms. Rudolph water

and again had Ms. Rudolph dump her puke bag into the toilet. Defendant CO Lien also

witnessed Ms. Rudolph vomit again at this time. Thus, Ms. Rudolph continued to vomit

continuously overnight on November 3.

46.

At 5:00 a.m. on November 3, Defendant CO Olson gave Ms. Rudolph "2 new

juice, a milk, and a full Gatorade for breakfast," since "she was on a liquid diet until she

stopped vomiting." When asked how she was doing, Ms. Rudolph "commented that

her throat was sore from throwing up."

47.

17

At some point after 5:00 a.m., but before 6:45 a.m., on November 3, Defendant CO Lien "heard sounds that sounded like to me sounds of distress coming from the high-risk cell." When Defendant Lien asked Ms. Rudolph if she needed anything, she responded that she again need a new vomit bag. Defendant Lien gave her a new bag and disposed of the old one. Later in that same period of time, Defendant Lien observed "CO Darren" assisting Ms. Rudolph with once again disposing of a vomit bag and providing a new one. Later that early morning, Ms. Rudolph asked Defendant Lien for a cup of water because the cups she had had spit in them. At some point that morning, Ms. Rudolph also asked CO Stetz for a cup of water. When he brought her the water, he asked what was in her old cup and she replied, "puke." He told her to dump it in the toilet. Thus, in the overnight hours of November 3, Ms. Rudolph filled another 4 bags with vomit in addition to vomiting in cups, and perhaps on the floor and in the toilet. She had been continually vomiting and incontinent—with diarrhea—at least since being moved to close observation solitary confinement, if not longer.

48.

At 12:00 p.m. on November 3, Defendant CO Then walked by Ms. Rudolph's cell and noticed that she was lying on her bed with "her eyes open and . . .a catatonic look on her face and was just gazing at the wall." She responded verbally "but she seemed out of it." CO Then asked Defendant Nurse Michelle to see Ms. Rudolph. Although Defendant CO Briana reported that "I asked if the Nurse Michelle could see her and she did," it does not appear from the nursing notes that Defendant Nurse Michelle Pender saw Ms. Rudolph until 2:00 p.m.

18

49.

Before being seen by Defendant Nurse Pender at 2:00 p.m., Defendant CO Rood gave Ms. Rudolph yet another new puke bag at 1:30 p.m. and had her empty her full one into the toilet. At approximately 1:45 p.m., Defendant CO Roberts looked in Ms. Rudolph's cell and "noticed on the floor what appeared to be a colored liquid of some type." He then asked staff in the control room if Ms. Rudolph "was on any medications to help with withdrawals from the drugs she had used." Defendant Nurse Pender told him that Ms. Rudolph was not on any medications but "she would talk to Ms. Rudolph and then check with the provider to see if there was something that could be started."

50.

Sometime at around 2:00 p.m. on November 3, Defendant Nurse Pender and Defendant Hermes entered Ms. Rudolph's cell and speak to her. Defendant Nurse Pender noted that Ms. Rudolph was easily awoken but that she was disoriented to space. Her pupils were less than 4 in size and she was "sluggish." Ms. Rudolph was "cool to the touch." Defendant CO Roberts overheard Ms. Rudolph tell Defendant Nurse Pender that she was "using gram [sic] of heroin a day for the past few months." Defendant Nurse Pender filled out the Chemical Withdrawal Flow Sheet, assigning Ms. Rudolph six points for "eating disturbances" and six points for "orientation" for a total score of twelve. If an inmate has a score of ten or more a physician is to be "contacted for further orders." Defendant Nurse Pender and the staff decided to take Ms. Rudolph to the shower.

88630860.1

51.

In the shower, Ms. Rudolph was unsteady. Defendant CO Hermes didn't want to leave Ms. Rudolph alone back there because she was afraid Ms. Rudolph might fall. Ms. Rudolph sat on the floor and at 2:07 p.m. her body began to jerk. Ms. Rudolph was pale and looked "catatonic." Defendant Health Tech White-Tuton left Ms. Rudolph and went into the control room. There she found Defendant Nurse Pender on the phone with a MeND MD "trying to figure out their next course of action with inmate Rudolph." Meanwhile, in the shower, Ms. Rudolph momentarily recovered and was moved to the bench in the shower. She then lost control of her bodily functions. At 12:17 an ambulance arrived, and medics began to tend to Ms. Rudolph. Ms. Rudolph was moved to the ambulance in the parking lot. At 2:52, resuscitation efforts were discontinued. Nineteen-year-old Abby Rudolph was dead.

52.

Pictures taken after Ms. Rudolph's death show a large volume of vomit was expelled from Ms. Rudolph's mouth during the attempted resuscitation. Paramedic Yancy's report stated the "vomit was dark in color and had somewhat of a coffee ground style consistency to it, indicating the presence of coagulated blood." Ms. Rudolph's body, as well as the surrounding area within the ambulance, "contained a lot [sic] amount of fluids on the floor." "I could see there was a large amount of reddish matter on Rudolph's face as well as around her head indicating there had been a large amount of vomiting as she was being cared for."

53.

Ms. Rudolph did not receive any treatment while in the jail—other than being put on a liquid diet—and did not see a physician at any point while incarcerated.

## COUNT I
## DENIAL OF DUE PROCESS RIGHT TO ADEQUATE MEDICAL CARE
### (As to all Defendants except Clay County)

54.

Plaintiff hereby realleges and incorporates by reference the allegations complained of above as if set forth specifically herein.

55.

While incarcerated in Defendants' custody, Abby Rudolph had a constitutional right under the substantive due process clause of the Eight and Fourteenth Amendments to the United States Constitution to have her basic human needs met, including receiving adequate medical care.  Deliberate indifference to an inmate's serious medical needs constitutes a violation of Ms. Rudolph's Eight and Fourteenth Amendment rights.

53.

Ms. Rudolph's constitutional right to receive adequate medical care under the Eight and Fourteenth Amendments was clearly established.

54.

Defendants' behavior far surpassed "mere negligence." Defendants willfully denied Ms. Rudolph adequate medical care and were deliberately indifferent to

21

Ms. Rudolph's medical needs. Ms. Rudolph had objectively serious medical needs. It was obvious, as demonstrated by the reactions of Ms. Rudolph's fellow inmate, her on-going and incessant vomiting and incontinence, and her disorientation, that Ms. Rudolph required immediate medical attention. Furthermore, Defendants knew of and disregarded a substantial risk of serious harm to Ms. Rudolph's health and safety. Defendants' acts and/or omissions in response to Ms. Rudolph's medical needs were so grossly incompetent and inadequate as to shock the conscience.

55.

As a direct and proximate result of Defendants' acts and/or omissions, as described herein, Defendants, while acting under color of state law, deprived Ms. Rudolph of her federal constitutional right to receive adequate medical care in violation of the Eight and Fourteenth Amendment and 42 U.S.C. § 1983.

56.

As a direct and proximate result of Defendants' acts and/or omissions, as described herein, decedent's heirs and next of kin have incurred funeral and burial costs, as well as other damages in connection with Ms. Rudolph's death, including but not limited to, loss of the advice, comfort, assistance, companionship, protection, counsel, guidance, aid, and future relationships and other contributions Abby Rudolph would have provided to them had she lived, or as otherwise available to them under 42 U.S.C. § 1983, all to their damage in a sum to be proved at trial, but presently estimated to be well in excess of Seventy Five thousand dollars.

88630860.1

## COUNT II
## DENIAL OF DUE PROCESS RIGHT TO LIFE
### (As to all Defendants except Clay County)

57.

Plaintiffs hereby reallege and incorporate by reference the allegations complained of above as if set forth specifically herein.

58.

Abby Rudolph had a right under the Eight Amendment of the United States Constitution and under the substantive due process clause of the Fourteenth Amendment to the United States Constitution not to be deprived of her life without due process of law.  While incarcerated in Defendants' custody, Ms. Rudolph was unable to care for herself, and because of this special relationship, Defendants had an affirmative duty to protect Ms. Rudolph from life-threatening medical conditions.  Defendants' acts and/or omissions in response to Ms. Rudolph's serious medical needs were so egregious and outrageous that Defendants' behavior can be fairly said to shock the conscience.

59.

Abby Rudolph's constitutional right not to be deprived of her life under the Eight and Fourteenth Amendments was clearly established.

60.

As a direct and proximate result of Defendants' acts and/or omissions, as

88630860.1

described herein, Defendants, while acting under color of state law, deprived

Ms. Rudolph of her federal constitutional right to life, in violation of the Eight and

Fourteenth Amendments and 42 U.S.C. § 1983.

61.

As a direct and proximate result of Defendants' acts and/or omissions, as

described herein, decedent's heirs and next of kin have incurred funeral and burial

costs, as well as other damages in connection with Ms. Rudolph's death, including but

not limited to, loss of the advice, comfort, assistance, companionship, protection,

counsel, guidance, aid, and future relationships and other contributions Abby Rudolph

would have provided to them had she lived, or as otherwise available to them under 42

U.S.C. § 1983, all to their damage in a sum to be proved at trial, but presently estimated

to be well in excess of Seventy Five thousand dollars.

## COUNT III
## DENIAL OF DUE PROCESS RIGHT TO ADEQUATE MEDICAL CARE
### (As to Defendant Clay County)

62.

Plaintiff hereby realleges and incorporates by reference the allegations

complained of above as if set forth specifically herein.

63.

While incarcerated in Defendant Clay County's custody, Abby Rudolph had a

constitutional right under the substantive due process clause of the Eight and

Fourteenth Amendments to the United States Constitution to have her basic human

needs met, including receiving adequate medical care.  Deliberate indifference to an

inmate's serious medical needs constitutes a violation of Ms. Rudolph's Eight and Fourteenth Amendment rights.

64.

Further, on information and belief, Clay County has had an on-going and systematic failure to properly provide adequate medical care and attention to inmates suffering from drug withdrawal such that it was a *defacto* policy and procedure of Clay County not to provide adequate medical care and attention to inmates suffering from drug withdrawal.

65.

Defendant Clay County's behavior far surpassed "mere negligence." Defendant Clay County's *defacto* policy of on-going and systematic failure to properly provide adequate medical care and attention to inmates suffering from drug withdrawal constituted a willful denial of adequate medical care to Ms. Rudolph, Defendant Clay County was deliberately indifferent to Ms. Rudolph's medical needs. Ms. Rudolph had objectively serious medical needs. It was obvious, as demonstrated by the reactions of Ms. Rudolph's fellow inmate, her on-going and incessant vomiting and incontinence, and her disorientation, that Ms. Rudolph required immediate medical attention. Furthermore, Defendant Clay County knew of and disregarded a substantial risk of serious harm to Ms. Rudolph's health and safety.  Defendant Clay County's acts and/or omissions in response to Ms. Rudolph's medical needs were so grossly incompetent and inadequate as to shock the conscience.

66.

88630860.1

As a direct and proximate result of Defendant Clay County's acts and/or omissions, as described herein, Defendant Clay County, while acting under color of state law, deprived Ms. Rudolph of her federal constitutional right to receive adequate medical care in violation of the Eight and Fourteenth Amendment and 42 U.S.C. § 1983.

67.

As a direct and proximate result of Defendant Clay County's acts and/or omissions, as described herein, decedent's heirs and next of kin have incurred funeral and burial costs, as well as other damages in connection with Ms. Rudolph's death, including but not limited to, loss of the advice, comfort, assistance, companionship, protection, counsel, guidance, aid, and future relationships and other contributions Abby Rudolph would have provided to them had she lived, or as otherwise available to them under 42 U.S.C. § 1983, all to their damage in a sum to be proved at trial, but presently estimated to be well in excess of Seventy Five thousand dollars.

**COUNT IV**
**DENIAL OF DUE PROCESS RIGHT TO LIFE**
**(As to Defendant Clay County)**

68.

Plaintiffs hereby reallege and incorporate by reference the allegations complained of above as if set forth specifically herein.

69.

Abby Rudolph had a right under the Eight Amendment of the United States Constitution and under the substantive due process clause of the Fourteenth Amendment to the United States Constitution not to be deprived of her life without due

26

process of law.  While incarcerated in Defendants' custody, Ms. Rudolph was unable to care for herself, and because of this special relationship, Defendants had an affirmative duty to protect Ms. Rudolph from life-threatening medical conditions.  Defendants' acts and/or omissions in response to Ms. Rudolph's serious medical needs were so egregious and outrageous that Defendants' behavior can be fairly said to shock the conscience.

70.

Further, on information and belief, Clay County has had an on-going and systematic failure to properly provide adequate medical care and attention to inmates suffering from drug withdrawal such that it was a *defacto* policy and procedure of Clay County not to provide adequate medical care and attention to inmates suffering from drug withdrawal.

71.

As a direct and proximate result of Defendant Clay County's acts and/or omissions, as described herein, Defendant Clay County, while acting under color of state law, deprived Ms. Rudolph of her federal constitutional right to life, in violation of the Eight and Fourteenth Amendments and 42 U.S.C. § 1983.

72.

As a direct and proximate result of Defendant Clay County's acts and/or omissions, as described herein, decedent's heirs and next of kin have incurred funeral and burial costs, as well as other damages in connection with Ms. Rudolph's death, including but not limited to, loss of the advice, comfort, assistance, companionship,

protection, counsel, guidance, aid, and future relationships and other contributions

Abby Rudolph would have provided to them had she lived, or as otherwise available to

them under 42 U.S.C. § 1983, all to their damage in a sum to be proved at trial, but

presently estimated to be well in excess of Seventy Five thousand dollars.

**COUNT V**
**FAILURE TO TRAIN**
**(As to Defendants Clay County and Savat)**

73.

Plaintiffs hereby reallege and incorporate by reference the allegations

complained of above as if set forth specifically herein.

74.

Abby Rudolph's suffering and death was a direct result not only of the

Defendants' acts and/or omissions in violation of the Eight and Fourteenth

Amendments to the federal constitution and 42 U.S.C. § 1983 as described herein, but

also of constitutional violations caused by failure of Defendant Clay County and jail

Administrator Savat to properly train the Clay County jail staff, including, Defendants

Justin Roberts, CO Raynor Blum, CO Nancy Livingood, CO Ashley Johnson, CO Tiffany

Larson, CO Deborah Benson, CO Jana Bartness, CO Ryan Magnuson, CO Anatacia

Hermes, CO Torkelson, CO Anthony Hanson, CO Amber Nelson, CO Cassie Olson, CO

Devin Lien, CO Richard Stetz, CO Brianna Then, CO Amy Rood, CO Lucas Heck, and

CO/Health Tech White-Tuton on how to adequately investigate, assess, and evaluate

inmates' medical needs, and how to determine whether to immediately provide

medical care and/or seek outside medical care for ailing inmates. The failure to train its

28

employees by Clay County in these ways amounted to deliberate indifference to Ms. Rudolph's constitutional rights.

75.

Further, on information and belief, Clay County has had an on-going and systematic failure to properly train its correctional officers and jail staff such that it is *defacto* policy and procedure of not properly training its jail staff in how adequately investigate, assess, and evaluate inmates' medical needs, and how to determine whether to immediately provide medical care and/or seek outside medical care for ailing inmates.

76.

As a direct and proximate result of the failure of Defendants Clay County and Savat to properly train its jail staff, as described herein, Defendants Clay County and Savat, while acting under color of state law, deprived Ms. Rudolph of her federal constitutional right to receive adequate medical care in violation of the Eight and Fourteenth Amendments and 42 U.S.C. § 1983 and her federal constitutional right to not be deprived of life, in violation of the Eight and Fourteenth Amendment and 42 U.S.C. § 1988.

77.

As a direct and proximate result of Defendants Clay County and Savat's acts and/or omissions, as described herein, decedent's heirs and next of kin have incurred funeral and burial costs, as well as other damages in connection with Ms. Rudolph's death, including but not limited to, loss of the advice, comfort, assistance,

companionship, protection, counsel, guidance, aid, and future relationships and other

contributions Abby Rudolph would have provided to them had she lived, or as

otherwise available to them under 42 U.S.C. § 1983, all to their damage in a sum to be

proved at trial, but presently estimated to be well in excess of Seventy Five thousand

dollars.

**COUNT VI**
**FAILURE TO TRAIN**
**(as to Defendant MEnD)**

78.

Plaintiffs hereby reallege and incorporate by reference the allegations

complained of above as if set forth specifically herein.

79.

Abby Rudolph's suffering and death was also a direct result of the failure of

Defendant MEnD to properly train its staff, including Defendant Nurse Pender on how

to adequately investigate, assess, and evaluate inmates' medical needs, and how to

determine whether to immediately provide medical care and/or seek outside medical

care for ailing inmates.

80.

As a direct and proximate result of the failure of Defendant MEnD to properly

train its staff, including Defendant Nurse Pender as described herein, decedent's heirs

and next of kin have incurred funeral and burial costs, as well as other damages in

connection with Ms. Rudolph's death, including but not limited to, loss of the advice,

comfort, assistance, companionship, protection, counsel, guidance, aid, and future

88630860.1

relationships and other contributions Abby Rudolph would have provided to them had she lived, all to their damage in a sum to be proved at trial, but presently estimated to be well in excess of Seventy Five thousand dollars.

<u>**COUNT IV**</u>
<u>**MEDICAL MALPRACTICE**</u>
**(as to Defendants MEnD and Pender)**

91.

Plaintiffs hereby reallege and incorporate by reference the allegations complained of above as if set forth specifically herein.

82.

Defendant Nurse Pender is a nurse employed by Defendant MEnD and, at all times herein relevant, was providing medical care to inmates at the Clay County jail, including Plaintiff Abby Rudolph.

83.

By the above-described actions and omissions, Defendant Nurse Pender breached her duty under Minnesota law to exercise an appropriate standard of professional care with respect to the treatment of Abby Rudolph.

84.

Defendants MEnD and Pender were negligent in the care and treatment rendered to Abby Rudolph. Illustrations of said negligence, cited by way of example but not limitation, are the following:

A.      Negligent failure to provide proper medical care;

31

B.      Negligent failure to appropriately assess and monitor the condition of

Ms. Rudolph;

C.      Negligent failure to use appropriate diagnostic means to evaluate

Ms. Rudolph condition;

D.      Negligent failure to diagnose Ms. Rudolph drug withdrawal and

accompanying dehydration;

E.      Negligent failure to consult with or refer Ms. Rudolph to qualified

medical personal, including specialists in a timely manner;

and Defendants MEnD and Pender were otherwise negligent in their care and treatment

of Ms. Rudolph in ways too numerous to herein mention.

85.

Defendant MEnD is liable for the medical negligence of Defendant Pender as

Respondent Superior and as a result of its negligent staffing of the Clay County Jail.

86.

As a direct and proximate result of the medical negligence of Defendants MEnD

and Pender Abby Rudolph died.

87.

As a direct and proximate result of the medical negligence of Defendants MEnD

and Pender, as described herein, decedent's heirs and next of kin have incurred funeral

and burial costs, as well as other damages in connection with Ms. Rudolph's death,

including but not limited to, loss of the advice, comfort, assistance, companionship,

protection, counsel, guidance, aid, and future relationships and other contributions

Abby Rudolph would have provided to them had she lived, all to their damage in a sum to be proved at trial, but presently estimated to be well in excess of Seventy Five thousand dollars.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against the Defendants, and each of them, jointly and severally, as follows:

A.      Finding that Defendants, and each of them, committed acts and omissions that constituted violations of the Eight and/or Fourteenth Amendment to the United States Constitution, actionable under 42 U.S.C. §1983;

B.      Finding that Defendants MEnD and Pender committed acts and omissions that constituted medial negligence;

C.      Awarding judgment in favor of Plaintiffs against the Defendants, and each of them, jointly and severally in an amount to be determined at trial as and for compensatory damages;

D.      Awarding Plaintiffs all applicable pre-judgment and post-judgment interest;

E.      Awarding Plaintiffs their attorney's fees and costs pursuant to 42 U.S.C. § 1988 and/or their contingency fee agreement; and

F.      Awarding such other and further relief as the Court may deem just and equitable.

88630860.1

**A TRIAL BY JURY ON ALL ISSUES SO TRIABLE IS HEREBY REQUESTED**.


Dated: April 16, 2018                    **ROBINS KAPLAN LLP**


                                         By:     _s/ Brandon Thompson_
                                                 Brandon Thompson (#349173)
                                                 _BThompson@RobinsKaplan.com_

                                         2800 LaSalle Plaza
                                         800 LaSalle Avenue
                                         Minneapolis, Minnesota 55402-2015
                                         T:      612-349-8500
                                         F:      612-339-4181

In Association with:                     **BENNEROTTE & ASSOCIATES, P.A.**


                                         By:  _s/ Vincent J. Mocci_o
                                             Vincent J. Moccio (MN# 184640)
                                             _vincent@ bennerotte.com_

                                         3085 Justice Way, Suite 200
                                         Eagan, Minnesota 55121
                                         T:   651-842-9257
                                         F:   651-288-0860

                                         _ATTORNEYS FOR PLAINTIFFS_

88630860.1

14-CV-17-684

Electronically Served
3/6/2017 10:41:38 AM
Clay County, MN

State of Minnesota

County of Clay

District Court

Seventh Judicial District
Wrongful Death

In the Matter of the Appointment of
Trustee for the Next-of-Kin of
Abby Rudolph, deceased.

## Order Appointing Trustee

The foregoing Petition, having been considered.

IT IS HEREBY ORDERED, that Jill Rudolph be and hereby is appointed trustee
for the next-of-kin of decedent, Abby Rudolph, to maintain the action described in said
Petition. The Court hereby waives a hearing and filing of a bond.

The trustee is authorized to sign any authorization for the release of decedent's
medical records under Minn. Stat. §144.293 Subd. 2.

Dated: ___March 1_____, 2017

BY THE COURT

_____
Judge of District Court

FILED
Court Administrator
CLAY COUNTY
March 1, 2017

87365788.1

**EXHIBIT A**