# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| Jill Rudolph, as Trustee for the Heirs and Next-of-Kin of Abby Rudolph, deceased,<br><br>    Plaintiffs,<br><br>vs.<br><br>MEnD Correctional Care, PLLC, and Michelle Pender, individually and in her capacity as Clay County Jail Nurse, and Clay County, Minnesota, and Julie Savat, individually and in her capacity as Clay County Jail Administrator, and Justin Roberts, individually and in his capacity as Clay County Assistant Jail Administrator, and CO Raynor Blum, CO Nancy Livingood, CO Ashley Johnson, CO Tiffany Larson, CO Deborah Benson, CO Jana Bartness, CO Ryan Magnuson, CO Anastacia Hermes, CO Joel Torkelson, CO Anthony Hanson, CO Amber Nelson, CO Cassie Olson, CO Devin Lien, CO Richard Stetz, CO Brianna Then, CO Amy Rood, and CO Lucas Heck, individually in their capacities as Clay County Correctional Officers, and CO Kari White-Tuton, individually and in her capacity as Clay County Jail Correctional Officer and Clay County Jail Health Tech,<br><br>    Defendants. | Case No.: 0:18-cv-1020<br><br>**STATEMENT OF THE CASE** |

### 1. Factual Background

Abby Rudolph was nineteen years old when she died. She had been struggling with addiction since she had become hooked on pain medication while recovering from

88630860.1

a broken hip she suffered her junior year in high school. Ms. Rudolph's struggle with addiction led to her arrest on the afternoon of October 30, 2016 for shoplifting. She was booked into the Clay County Jail at 5:29 p.m. She had a hypodermic needle cap in her possession.

The following morning, at 10:00 a.m., MEnd nurse, Defendant Michelle Pender, did a medical assessment. Defendant Pender noted that Abby was a heroin user but, based on what Ms. Rudolph told her, noted that her last use was "4 months ago." A drug test was not performed. A MEnd chemical withdrawal flow chart was not used or filled out at that time.

At approximately 7:30 p.m. that evening, Defendant CO Raynor Blum was conducting rounds when a female inmate informed him that she was concerned for Ms. Rudolph because Ms. Rudolph was going though drug withdrawal. This inmate also claimed that Ms. Rudolph had drugs in her jail locker. Because the inmate was "hard to understand," Defendant CO Blum asked that she write down her concerns and told her he would pick them up on his next round.

On his next round, Defendant CO Blum received a note stating that Ms. Rudolph had been experiencing withdrawal symptoms the previous evening and that she had not eaten or drank anything. Defendant Blum turned the note over to Defendant Team Leader Nancy Livingood. Defendant Livingood pulled Ms. Rudolph out of the female block and spoke with her, addressing the concerns of the other females. She reported that Ms. Rudolph indicated that she had "used a little," but, according to Defendant Livingood, "she was fine and she appeared to be doing ok."

2

The note from Abby Rudolph's fellow inmates also stated that Ms. Rudolph had heroin in her locker, located in her underwear. Defendant Livingood checked Ms. Rudolph's locker and found a clear package in the underwear containing substances. Testing showed that one of the substances was meth. It was believed that the other was heroin, but that needed to be confirmed.

One of the reporting inmates was interviewed on November 9, 2016—after Ms. Rudolph's death. See was never questioned about Ms. Rudolph's condition and behavior at the time the note was given to CO Blum. In the interview, the reporting inmate stated that Ms. Rudolph was fine when she came in on October 30, but on October 31, her condition deteriorated throughout the course of the day. When Ms. Rudolph returned from court on the 31st, the reporting inmate learned that she was a heroin addict who was using approximate ½ gram per usage prior to being incarcerated and, as a result of her incarceration, was in the process of coming off heroin. Soon after, Ms. Rudolph began to become weak. On the evening of October 31, because they were concerned for Ms. Rudolph's health, the inmates wrote the note and gave it to Defendant CO Blum. They asked that Ms. Rudolph be moved and monitored because of her deteriorating condition. Abby was removed at approximately 9:00 p.m. on October 31 and moved to holding cell #3.

At 5:00 a.m. on November 1, Ms. Rudolph informed Defendant CO Johnson that she could not eat her breakfast. According to jail records, that morning, Ms. Rudolph "puked multiple times and missed the toilet a few times." Defendant CO Larson observed a "green chunky substance, which appeared to be vomit, on the floor next to

3

her mattress." Defendant Larson also observed "various [bodily] fluids throughout the cell," which "had a bad smell." The jail records report that Ms. Rudolph was ill because she "was coming down from drugs."

When Defendant Larson informed Defendant Team Leader Benson of Ms. Rudolph's condition and the condition of her cell, Defendant Benson's gave Ms. Rudolph a bucket and some new clothes and told Ms. Rudolph to clean it up. Ms. Rudolph then showered because she had soiled herself, was given clean underwear, and cleaned up her cell. Defendant Larson then administered a Urine Analysis Test that showed that Ms. Rudolph was positive for THC, Methamphetamine, Opioids, and Amphetamines.

Fourteen hours later, at 7:00 p.m. on November 1, Ms. Rudolph was still ill and still puking. She was also reported to be "talking and not making much sense." As a result, she was moved to the "High Risk" cell at 7:50 p.m. for close observation. According to jail records, "She was placed on a 15-–minute watch due to her detoxing." During the transfer, Ms. Rudolph told Defendant Bartness that she "was detoxing from heroin." The jail's "close watch sheet" indicates Ms. Rudolph was "moved to 'HR'" at "1950," and that she was "Medical – detoxing heroin." At about 9:30 p.m., Ms. Rudolph called to Defendant Hanson. When he responded, he saw vomit in Ms. Rudolph's toilet and found Ms. Rudolph lying on a mat on the floor near the toilet with a towel covering her head and eyes.

At 1:45 a.m. on November 2, Ms. Rudolph asked Defendant CO Magnuson for some Gatorade to help with her withdrawal. CO Magnuson found that there was no

4

Gatorade in the refrigerator and gave Ms. Rudolph nothing. At some point on the morning of November 2, Defendant CO Roberts checked on Ms. Rudolph and found her lying on her mattress, which was on the floor. There was feces in the toilet and soiled underwear lying next to her on the floor. With the assistance of Defendant COs Hermes, they awoke Ms. Rudolph and had her put her soiled materials in a biohazard bag. They then took her to get a shower and cleaned the cell. They discovered that Ms. Rudolph "had [soiled] herself while in bed and found what appeared to be urine on the floor."

After returning to the cell, Ms. Rudolph indicated that she was keeping her mattress on the floor to be close to the toilet in case she needed to vomit. Defendant CO Roberts then spoke to Defendant Nurse Michelle Pender and Defendant Health Tech White-Tuton who informed him that Ms. Rudolph was "going through withdrawals and that a urine analyze [sic] showed positive for Methamphetamine and Opioids." Defendants Pender and White-Tuton told CO Roberts that they had spoken to Ms. Rudolph about drinking fluids and were putting her on a liquid diet.

At 10:00 a.m. on November 2, Ms. Rudolph had a visit with Defendant Nurse Pender who noted that Ms. Rudolph was "starry eyed @ times." She also noted that Ms. Rudolph reported being "sick to my stomach." When Defendant Nurse Pender "encouraged" Ms. Rudolph "to use the toilet instead of being incontinent on the floor," Ms. Rudolph responded that, "she did not realize what she was doing." During this visit, Defendant Nurse Pender, for the first time, filled in the Chemical Withdrawal Flow Sheet. Ms. Rudolph was given six points for "eating disturbances," but was given

5

zero points for "orientation" and zero points for hallucinations despite having been reported to be "talking and not making much sense," and despite admitting to Nurse Pender that she did not realize she had been incontinent on the floor of her cell. If she had been property scored, her score would have been in excess of 10 meaning that a Medical Doctor was to "contacted for further orders." No MD was contacted, and no treatment was administered.

After dinner on November 2, Defendant CO Nelson was retrieving Ms. Rudolph's tray when Ms. Rudolph asked her "for a new blue bag for puking." CO Nelson got a red biohazard bag and brought it to Ms. Rudolph's cell. She asked Ms. Rudolph to "place her blue bag full of vomit in" and gave her a "new blue puke bag." At some point later in the evening, Defendant CO Bartness asked Defendant CO Heck to once again "give Ms. Rudolph a new puke bag." CO Heck went to the high-risk cell where Ms. Rudolph handed him "her current puke bag," and Defendant Bartness gave Ms. Rudolph a fresh bag. Defendant Heck dumped the full puke bag in the toilet in the high-risk cell and "noticed that the puke was liquid, dark brown, and appeared to have small black speckles."

On November 3 at 12:30 a.m., Defendant CO Olson gave Ms. Rudolph a half bottle of Gatorade, a glass of water, and a yet another new "puke bag." CO Olson observed Ms. Rudolph "sit up and squat next to the toilet and dump the old bag out." Thus, based on the CO reports, Ms. Rudolph filled at least three blue puke bags and also puked on the floor multiple times between 7:50 p.m. on November 1 and 12:30 a.m. on November 3. Just one and one-half hours later, at 2:00 a.m., the close watch sheets

6

indicate that another unidentified CO gave Ms. Rudolph "water, new vomit bag." Just two and one-half hours later, at 4:34 a.m., Defendant CO Olson gave Ms. Rudolph water and again had Ms. Rudolph dump her puke bag into the toilet. Defendant CO Lien also witnessed Ms. Rudolph vomit again at this time. Thus, Ms. Rudolph continued to vomit continuously overnight on November 3.

At 5:00 a.m. on November 3, Defendant CO Olson gave Ms. Rudolph "2 new juice, a milk, and a full Gatorade for breakfast," since "she was on a liquid diet until she stopped vomiting." When asked how she was doing, Ms. Rudolph "commented that her throat was sore from throwing up."

At some point after 5:00 a.m., but before 6:45 a.m., on November 3, Defendant CO Lien "heard sounds that sounded like to me sounds of distress coming from the high-risk cell." When Defendant Lien asked Ms. Rudolph if she needed anything, she responded that she again need a new vomit bag. Defendant Lien gave her a new bag and disposed of the old one. Later in that same period of time, Defendant Lien observed "CO Darren" assisting Ms. Rudolph with once again disposing of a vomit bag and providing a new one. Later that early morning, Ms. Rudolph asked Defendant Lien for a cup of water because the cups she had had spit in them. At some point that morning, Ms. Rudolph also asked CO Stetz for a cup of water. When he brought her the water, he asked what was in her old cup and she replied, "puke." He told her to dump it in the toilet. Thus, in the overnight hours of November 3, Ms. Rudolph filled another 4 bags with vomit in addition to vomiting in cups, and perhaps on the floor and in the toilet. She had been continually vomiting and incontinent—with diarrhea—at least since being

7

moved to close observation solitary confinement, if not longer.

At 12:00 p.m. on November 3, Defendant CO Then walked by Ms. Rudolph's cell and noticed that she was lying on her bed with "her eyes open and . . .a catatonic look on her face and was just gazing at the wall." She responded verbally "but she seemed out of it." CO Then asked Defendant Nurse Michelle to see Ms. Rudolph. Although Defendant CO Briana reported that "I asked if the Nurse Michelle could see her and she did," it does not appear from the nursing notes that Defendant Nurse Michelle Pender saw Ms. Rudolph until 2:00 p.m.

Before being seen by Defendant Nurse Pender at 2:00 p.m., Defendant CO Rood gave Ms. Rudolph yet another new puke bag at 1:30 p.m. and had her empty her full one into the toilet. At approximately 1:45 p.m., Defendant CO Roberts looked in Ms. Rudolph's cell and "noticed on the floor what appeared to be a colored liquid of some type." He then asked staff in the control room if Ms. Rudolph "was on any medications to help with withdrawals from the drugs she had used." Defendant Nurse Pender told him that Ms. Rudolph was not on any medications but "she would talk to Ms. Rudolph and then check with the provider to see if there was something that could be started."

Sometime at around 2:00 p.m. on November 3, Defendant Nurse Pender and Defendant Hermes entered Ms. Rudolph's cell and speak to her. Defendant Nurse Pender noted that Ms. Rudolph was easily awoken but that she was disoriented to space. Her pupils were less than 4 in size and she was "sluggish." Ms. Rudolph was "cool to the touch." Defendant CO Roberts overheard Ms. Rudolph tell Defendant

8

Nurse Pender that she was "using gram [sic] of heroin a day for the past few months." Defendant Nurse Pender filled out the Chemical Withdrawal Flow Sheet, assigning Ms. Rudolph six points for "eating disturbances" and six points for "orientation" for a total score of twelve. If an inmate has a score of ten or more a physician is to be "contacted for further orders." Defendant Nurse Pender and the staff decided to take Ms. Rudolph to the shower.

In the shower, Ms. Rudolph was unsteady. Defendant CO Hermes didn't want to leave Ms. Rudolph alone back there because she was afraid Ms. Rudolph might fall. Ms. Rudolph sat on the floor and at 2:07 p.m. her body began to jerk. Ms. Rudolph was pale and looked "catatonic." Defendant Health Tech White-Tuton left Ms. Rudolph and went into the control room. There she found Defendant Nurse Pender on the phone with a MeND MD "trying to figure out their next course of action with inmate Rudolph." Meanwhile, in the shower, Ms. Rudolph momentarily recovered and was moved to the bench in the shower. She then lost control of her bodily functions. At 12:17 an ambulance arrived, and medics began to tend to Ms. Rudolph. Ms. Rudolph was moved to the ambulance in the parking lot. At 2:52, resuscitation efforts were discontinued. Nineteen-year-old Abby Rudolph was dead.

Pictures taken after Ms. Rudolph's death show a large volume of vomit was expelled from Ms. Rudolph's mouth during the attempted resuscitation. Paramedic Yancy's report stated the "vomit was dark in color and had somewhat of a coffee ground style consistency to it, indicating the presence of coagulated blood." Ms. Rudolph's body, as well as the surrounding area within the ambulance, "contained

9

a lot [sic] amount of fluids on the floor." "I could see there was a large amount of reddish matter on Rudolph's face as well as around her head indicating there had been a large amount of vomiting as she was being cared for."

### 2. Particularized Facts

While incarcerated in Defendants' custody, Abby Rudolph had a constitutional right under the substantive due process clause of the Eight and Fourteenth Amendments to the United States Constitution to have her basic human needs met, including receiving adequate medical care. Deliberate indifference to an inmate's serious medical needs constitutes a violation of Ms. Rudolph's Eight and Fourteenth Amendment rights.

Ms. Rudolph's constitutional right to receive adequate medical care under the Eight and Fourteenth Amendments was clearly established.

Defendants' behavior far surpassed "mere negligence." Defendants willfully denied Ms. Rudolph adequate medical care and were deliberately indifferent to Ms. Rudolph's medical needs. Ms. Rudolph had objectively serious medical needs.

As a direct and proximate result of Defendants' acts and/or omissions, as described herein, Defendants, while acting under color of state law, deprived Ms. Rudolph of her federal constitutional right to receive adequate medical care in violation of the Eight and Fourteenth Amendment and 42 U.S.C. § 1983.

While incarcerated in Defendant Clay County's custody, Abby Rudolph had a constitutional right under the substantive due process clause of the Eight and Fourteenth Amendments to the United States Constitution to have her basic human

needs met, including receiving adequate medical care. Deliberate indifference to an inmate's serious medical needs constitutes a violation of Ms. Rudolph's Eight and Fourteenth Amendment rights.

Further, on information and belief, Clay County has had an on-going and systematic failure to properly provide adequate medical care and attention to inmates suffering from drug withdrawal such that it was a *defacto* policy and procedure of Clay County not to provide adequate medical care and attention to inmates suffering from drug withdrawal.

Defendant Nurse Pender is a nurse employed by Defendant MEnD and, at all times herein relevant, was providing medical care to inmates at the Clay County jail, including Plaintiff Abby Rudolph.

By the above-described actions and omissions, Defendant Nurse Pender breached her duty under Minnesota law to exercise an appropriate standard of professional care with respect to the treatment of Abby Rudolph.

Defendants MEnD and Pender were negligent in the care and treatment rendered to Abby Rudolph. Illustrations of said negligence, cited by way of example but not limitation, are the following:

 A. Negligent failure to provide proper medical care;

 B. Negligent failure to appropriately assess and monitor the condition of Ms. Rudolph;

 C. Negligent failure to use appropriate diagnostic means to evaluate Ms. Rudolph condition;

  D. Negligent failure to diagnose Ms. Rudolph drug withdrawal and accompanying dehydration;

  E. Negligent failure to consult with or refer Ms. Rudolph to qualified medical personal, including specialists in a timely manner;

and Defendants MEnD and Pender were otherwise negligent in their care and treatment of Ms. Rudolph in ways too numerous to herein mention.

Defendant MEnD is liable for the medical negligence of Defendant Pender as Respondent Superior and as a result of its negligent staffing of the Clay County Jail.

  **3. Damages**

Funeral and burial expenses incurred by Abby Rudolph's next-of-kin and damages associated with the permanent and substantial loss of the support, advice, comfort, assistance, companionship, protection, counsel, guidance, aid and future relationships and other contributions Abby Rudolph would have provided to plaintiff had she lived, which are substantial but not susceptible to mathematical computation at this time and shall be determined by the jury.

Dated: August 16, 2018      **BENNEROTTE & ASSOCIATES, P.A.**

             By: *s/ Vincent J. Moccio*
               Vincent J. Moccio (MN# 184640)
               vincent@bennerotte.com

             3085 Justice Way, Suite 200
             Eagan, Minnesota 55121
             T: 651--842--9257
             F: 651--288—0860

IN ASSOCIATION WITH:	ROBINS KAPLAN LLP


By:	*s/ Brandon Thompson*
Brandon Thompson (#349173)
*BThompson@RobinsKaplan.com*

2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, Minnesota 55402-‐2015
T:	612-‐349-‐8500
F:	612-‐339-‐4181


*Attorneys for Plaintiffs*