# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| Craig Casler, as Trustee for the Heirs and Next-of-Kin of Abby Rudolph, deceased,<br><br>Plaintiff,<br><br>vs.<br><br>Clay County, Minnesota, *et al.*,<br><br>Defendants. | Case No.: 18-CV-1020 (WMW/LIB)<br><br>**Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Exclude Expert Testimony** |

## Introduction

Plaintiff's expert witnesses were significantly and substantively involved in the preparation of their expert reports. The opinions in those reports were disclosed before the Court-ordered deadline, and Defendant was properly on notice of the substance of those opinions. The experts formulated their opinions using a reliable methodology, and those opinions will undoubtedly assist the jury in understanding the critical evidence in this case. Plaintiff's expert witnesses should not be excluded.

## Factual & Procedural Background[1]

On April 16, 2018, Plaintiff filed a Complaint alleging, among other things, that Defendant Clay County, Minnesota ("Clay County") and its correctional officers violated Abby Rudolph's constitutional right to adequate medical care and her right to life. (ECF Doc. #1, ¶¶ 54-72.) Discovery commenced, and the Court's Amended Scheduling Order provided that Plaintiff was to disclose the identity of expert witnesses and provide reports by May 10, 2019. (ECF Doc. #39 at 5.)

### I. Plaintiff provided expert reports detailing the opinions of its expert witnesses before the deadline set by the Amended Scheduling Order.

On May 8, 2019, Plaintiff served upon counsel for Clay County reports identifying three expert witnesses: Mary Ann Sens, M.D., Ph.D., Kathryn J. Wild, RN, MPA, CCHP-RN, and Mark Leon Willenbring, M.D. (*See* Declaration of Colin F. Peterson ("Peterson Dec."), Ex. A.) Dr. Sens, a pathologist, was disclosed as an expert who would testify regarding the cause of Abby Rudolph's death. (Declaration of Jason M. Hiveley ("Hiveley Dec."), Ex. 2.) Ms. Wild, a correctional health nurse, was disclosed as an expert who would testify regarding the conduct of the Clay County correctional officers and their collaboration with the correctional nursing staff. (*Id.*, Ex. 3.) Dr. Willenbring, an addiction medicine specialist, was disclosed as an expert who would testify regarding addiction medicine issues and explain to the jury why the correctional officers' failure to involve a physician in Ms. Rudolph's care was a legal cause of her death. (*Id.*, Ex. 4.)

---

[1] Detailed facts regarding Abby Rudolph's incarceration at Clay County Jail are provided in Plaintiff's Opposition to Defendants' Motion for Summary Judgment. To avoid redundancy, this Memorandum will focus only on the facts most relevant to the Motion to Exclude Expert Testimony.

2

Each expert report was signed by the witnesses in front of a notary public.[2] (*See id.*, Ex. 2 at 8, Ex. 3 at 15, Ex. 4 at 13.) In so doing, the experts represented that the report "accurately provides the substance of the facts and opinions to which I will testify in this matter, as well as a summary of the grounds for each opinion." (*Id.*) The reports also provided the following information, as required by Fed. R. Civ. P. 26(a)(2)(B): the qualifications of the witnesses, a complete statement of all opinions to be expressed, the bases and reasons for those opinions, and the information that the witnesses considered in forming their opinions. (*See id.*, Exs. 2-4.) The information disclosed in the reports was comprehensive, with the documents comprising of 33, 83, and 73 paragraphs respectively. (*See id.*)

II. **Plaintiff served written discovery responses that explicitly referred to the previously served expert disclosures.**

On July 12, 2019, Plaintiff served its Answers to Clay County's Interrogatories to Plaintiff. (Peterson Dec., Ex B.) In response to multiple Interrogatories, Plaintiff responded "[s]ee expert disclosures previously provided" or "see expert disclosures." (Peterson Dec., Ex. C, at 4-6.)

III. **Three months after Plaintiff's expert reports were disclosed, Defendants—for the first time—claimed that the reports were deficient, and has maintained that position despite Plaintiff promptly curing the deficiencies.**

Defendants had a deadline of July 9, 2019 to serve their expert disclosures. No disclosures were served. As a result, on August 9, 2019, Plaintiff's counsel contacted counsel for Clay County to inquire when, it at all, expert reports would be produced. (Hiveley Dec., Ex. 5 at 4.) Defense counsel replied that Clay County

---

[2] The reports were also signed by Plaintiff's counsel, Colin F. Peterson, who confirmed under oath that the opinions contained in the reports were opinions that were held by the experts themselves. (Hiveley Dec., Exs. 2-4.)

3

did not disclose any experts because it believed Plaintiff's reports were deficient under Rule 26(a)(2). (*Id.* at 1-4.) Plaintiff's counsel responded that the reports would be supplemented to address these alleged deficiencies (*id.* at 1), and the expert reports were promptly supplemented on August 19, 2019. (Peterson Dec., Exs. D, E, & F.)

The discovery cut-off was September 9, 2019. At no point during discovery did defense counsel request to take the deposition of any of Plaintiff's expert witnesses. Ten days after the discovery cut-off, however, defense counsel emailed Plaintiff's counsel to re-assert the claim that Plaintiff's expert disclosures were deficient, despite the August 19 supplementation. (Hiveley Dec., Ex. 6.) Defense counsel further stated that he intended to bring a motion to exclude all of Plaintiff's experts, but would alternatively propose discussing the matter with the Court and request an extension of expert disclosure deadlines to allow defense to disclose rebuttal experts. (*Id.*) Plaintiff's counsel inadvertently failed to read this email as they were preparing for a trial that was set to begin in four days. No attempts were made by defense counsel to follow up on the September 19, 2019 email.

During a break in trial, Plaintiff's counsel reviewed his email inbox and saw the September 19, 2019 email. Plaintiff's counsel responded, "I'm in the middle of trial right now. You know our position on our expert disclosures, but we agree to extend your expert disclosure deadlines to accommodate a response. If you have time to draft a stipulation please send it over and we will review." (Peterson Dec., Ex. G at 1-2.) Having not received any response, Plaintiff's counsel followed up on the issue after trial was over. (*Id.* at 1.) Defense counsel replied that the deadline to file non-dispositive motions had passed. (*Id.*) This Motion followed two months later.

4

## Argument

Plaintiff disclosed the identity of its expert witnesses and provided Defendants with a significant amount of detail regarding their opinions and the bases for those opinions before the expert disclosure deadline. Each expert substantially participated in the preparation of their reports and affirmatively stated that the reports accurately reflected their opinions in this case. When Defendants pointed out technical deficiencies in the reports regarding the expert's compensation and previous testimony, Plaintiff immediately provided this information. Had Defendants raised their objections promptly after being served with the expert reports, this information would have been provided even sooner. In any event, the late disclosure of the supplemental information did not result in any significant prejudice. Defendants had a full and fair opportunity to depose Plaintiff's experts or file a motion to extend their expert disclosure deadlines. They chose not to.

In addition to the discovery-based issues[3], Defendants' Motion seeks to exclude Plaintiff's experts based on Fed. R. Evid. 702 and *Daubert*. Plaintiff's experts, however, are sufficiently qualified, their opinions are reliable, and they will undoubtedly assist the jury in understanding the evidence. The motion should be denied.

### I. The identity of Plaintiff's experts and the substance of their opinions were timely disclosed.

Plaintiff disclosed the opinions of its expert witnesses on May 8, 2019. The opinions disclosed were highly-detailed and the bases for those opinions were

---

[3] To the extent that Defendants' arguments relate to discovery disputes, they should have been raised in a discovery motion before the non-dispositive motion deadline passed. That said, Plaintiff will nevertheless respond to all of these arguments in this Memorandum.

5

clearly identified. Though the caption of the reports mistakenly referred to the documents as Minn. Stat. § 145.682 affidavits, a review of the reports demonstrates that they met the substantive requirements of Rule 26(a)(2)(B) with respect to the expert's opinions. As such, Defendants were on notice that the expert witnesses would testify regarding the claims against Clay County.

For example, Ms. Wild's affidavit states that she was "was asked to review the conduct of the **correctional officers**" and that her opinion is that the "care provided by the **correctional officers** at Clay County Jail departed from the standards of reasonable care." (Hiveley Dec., Ex. 3 at ¶¶ 2-3 (emphasis added).) The disclosed opinions of Ms. Wild related only to the conduct of Clay County's correctional officers—there were no criticisms of the conduct by MEnD Correctional Care, PLLC, Michelle Pender, or anyone else.

Ms. Wild's report also contained her opinions regarding the standards that applied to the **correctional officers**, including standards promulgated by the National Commission on Correctional Health Care. (*Id.* at ¶¶ 61-73.) Ms. Wild's report specifically referenced the Clay County Jail policies that that the correctional officers were required to follow. (*Id.* at ¶¶ 62, 64-65, 69-70.) As explained in the expert report, Ms. Wild's ultimate opinion was that the correctional officers departed from the standards and policies that governed their conduct, and that their conduct amounted to "callous indifference to Ms. Rudolph's serious medical condition." (*Id.* at ¶ 78.)[4]

---

[4] If there was any doubt about the fact that Ms. Wild's opinions related to the constitutional claims against Clay County, all doubt would have been resolved by the supplemental Rule 26(e) Declaration served on August 19, 2019 disclosing that Ms. Wild had an "opinion, to a reasonable degree of certainty, that the correctional officers' departures from accepted standards of reasonable care—as detailed in the [report served on May 8, 2019]—demonstrated deliberate

Plaintiff further disclosed that Ms. Wild had opinions that the conduct of the Clay County **correctional officers** were a direct cause of Ms. Rudolph's death. Plaintiff disclosed that Ms. Wild held the following opinion regarding causation:

> ... [H]ad the correctional officers timely communicated information about Ms. Rudolph's intractable vomiting and diarrhea, and her concerning behavioral changes, a reasonable nurse would have ruled out the possibility of dehydration by calling a physician for a consult. If the physician determined that the inmate was dehydrated, interventions more likely than not would have been performed to treat the dehydration.

(*Id.* at ¶ 81.)

Similarly, Plaintiff disclosed Dr. Willenbring's opinions regarding how the correctional officers' conduct contributed to Ms. Rudolph's death. Dr. Willenbring was disclosed as holding an "opinion to a reasonable degree of medical certainty that the failure to involve a physician in Ms. Rudolph's care played a substantial part in preventing her from receiving the care and treatment that she needed to save her life." (Hiveley Dec., Ex. 4 at ¶ 5.) Dr. Sens was also disclosed regarding the cause of death as well, albeit from a pathological standpoint. Dr. Sens "was asked review information about Ms. Rudolph's condition in the Clay County Jail and the results of the autopsy of Ms. Rudolph to determine the most likely cause of Ms. Rudolph's death." (Hiveley Dec., Ex. 2 at ¶ 3.)

---

indifference to Ms. Rudolph's serious medical condition." (Peterson Aff., Ex. F at ¶ 5.)

7

## II. Plaintiff's expert reports were appropriately prepared by the expert witnesses.

Rule 26(a)(2)(B) requires that an expert report be "prepared and signed by the witness," but an attorney may assist the expert in drafting the report:

> Rule 26(a)(2)(B) does not preclude counsel from providing assistance to experts in preparing the reports…. Nevertheless, the report, which is intended to set forth the substance of the direct examination, should be written in a manner that reflects the testimony to be given by the witness and it must be signed by the witness.

Fed. R. Civ. P. 26 advisory committee's note. 1993 Amendment. *See also Estate of LaFarge ex rel. Blizzard v. Kyker*, No. 1:08CV185, 2011 WL 6151595, at *6 (N.D. Miss. Dec. 12, 2011) (finding that an attorney support in preparing the expert report did not "exceed bounds of legitimate assistance"); *Seitz v. Envirotech Sys. Worldwide Inc.*, No. H-02-4782, 2008 WL 656513, at *2 (S.D. Tex. Mar. 6, 2008) ("Several courts have addressed the permissible amount of attorney involvement in drafting an expert report" and "conclude[d] that as long as the substance of the opinions is from the expert, the attorney's involvement in the written expression of those opinions does not make them inadmissible."); *Manning v. Crockett*, No. 95 C 3117, 1999 WL 342715, at *3 (N.D. Ill. May 18, 1999) ("some attorney involvement in the preparation of an expert report is permissible…but the expert must substantially participate in the preparation of an expert report.").

Each of Plaintiff's experts were involved in the preparation of their expert reports. Each expert spent several hours reviewing hundreds of pages of records related to Abby Rudolph's medical history and the time she spent at Clay County Jail and formulated opinions based on that information. (Peterson Dec.,

8

Exs. H, I, & J.) After their review was complete, the experts had a telephone conference with Plaintiff's counsel where they shared the results of their review and provided their expert opinions. (*Id.*, ¶ 2.) Plaintiff's counsel then typed an initial draft of a report that reflected the expert opinions that were communicated during the conference. (*Id.*) Those draft reports were provided to the expert who had a full opportunity to inform Plaintiff's counsel of any revisions that needed to be made to their opinions. (*Id.*) Once the documents were deemed satisfactory to the experts, they each signed the reports.

The Rules do not prohibit an attorney from typing a Rule 26 report so long as the substantive opinions contained in the report were formulated by the expert witness. The expert reports in this case clearly indicated that the opinions were held by the expert—indeed, the reports stated repeatedly that the expert would testify to these opinions, under oath, at trial. *Cf. St. Jude Med. S.C., Inc. v. Tormey*, No. CIV. 11-327 MJD/TNL, 2013 WL 3270382, at *8 (D. Minn. June 26, 2013) (precluding expert testimony from witness when it was clear that the expert had not seen or contributed to the expert report in any way.)

### III. Because Plaintiff appropriately disclosed the substance of their experts' opinions, there is no credible claim of "unfair surprise."

"The essential purpose of Rule 26(a)(2)(B) is to assure that an expert report is sufficiently complete, detailed and in compliance with the Rules so that surprise is eliminated, unnecessary depositions are avoided and costs are reduced." *King v. Reed, LLC*, No. CIV.071908DWF/RLE, 2008 WL 7514360, at *2 (D. Minn. Oct. 6, 2008) (internal quotations omitted). This Court considers motions to exclude expert opinions "with a critical consideration being the prevention of unfair surprise." *Transclean Corp. v. Bridgewood Services, Inc.*, 101 F. Supp. 2d 788, 795 (D. Minn. 2000).

As explained above in Section I, Plaintiff's reports were sufficiently detailed to prevent any surprise. Nevertheless, Defendants claim that they remain unaware of the true opinions of Plaintiff's experts and "bound to be surprised by the true opinions of the identified experts" because all that was disclosed was the "representations of Plaintiff's counsel." (Defs.' Br. at 9.) That argument is unavailing for at least four reasons.

First, Plaintiff's counsel signed a sworn statement that the opinions detailed in the expert reports are held by the experts. Defendants' argument therefore relies on the implicit accusation that Plaintiff's counsel has committed perjury. Second, and more importantly, is that each expert signed a notarized verification stating in no uncertain terms that their expert report "accurately provides the substance of the facts and opinions to which I will testify in this matter, as well as a summary of the grounds for each opinion." (*See* Hiveley Dec., Ex. 2 at 8, Ex. 3 at 15, Ex. 4 at 13.) Third, with respect to Ms. Wild's opinions, her supplemental declaration confirmed that her expert report "thoroughly and comprehensively detailed my opinions on the conduct of the correctional officers

10

and the basis for those opinions, including the underlying facts of Ms. Rudolph's incarceration." (Peterson Dec., Ex. F at ¶ 2.) Finally, as Defendants' brief points out, unfair surprise can be eliminated by taking a deposition of the expert in advance of a trial. Defendants had the opportunity to depose Plaintiff's experts before the discovery cut-off, but chose not to.

Simply put, Defendants are fully aware of the opinions of Plaintiff's experts, and have been for several months. The opinions were disclosed before the deadline set by the Court, and the substance of those opinions has not changed. There is no credible argument that Defendants would be surprised if Plaintiff's experts testified consistently with these disclosed opinions are trial.

IV. **Defendants failed to timely raise objections regarding the alleged deficiencies, but Plaintiff nevertheless promptly cured the deficiencies once Defendant made its position known.**

Plaintiff served its expert reports in May and then explicitly referred to those reports in written discovery responses in July. Defendants, however, did not raise any objections regarding Plaintiff's expert disclosures until August 9, 2019, after being prompted by Plaintiff's counsel. At that time, Plaintiff was concerned that perhaps Defendants' expert disclosures had not been provided due to a simple oversight or administrative error.

Defense counsel's response to this inquiry was the first time any objection to Plaintiff's expert reports was raised. Plaintiff cured the alleged deficiencies through supplemental disclosures that were served only ten days after Defendants first raised their objections. As such, the reason for the late disclosures is in no small part due to Defendants failing to raise any objection

11

until three months after they were served, despite adequate notice of the opinions.

V.  **The opinions of Plaintiff's experts are admissible under Rule 702, and are absolutely necessary to prove Plaintiff's claims.**

In order to perform a proper analysis under Rule 702, it is first necessary to understand the substance of Plaintiff's claims against Clay County and its correctional officers. At trial, Plaintiff will allege that Clay County violated Abby Rudolph's constitutional rights by failing to have her evaluated by a physician. This was the result of the correctional officers' failure to appropriately communicate relevant information about Ms. Rudolph's condition to a nurse. Plaintiff's expert Ms. Wild will provide expert testimony that will assist the jury in determining whether Clay County's failure to appropriately communicate demonstrated "deliberate indifference" to Ms. Rudolph's serious medical condition. Plaintiff's experts will also testify regarding the causal effects of Clay County's conduct, which is an essential element to Plaintiff's claim.

Expert testimony will be presented to explain to the jury that if Clay County correctional officers acted consistent with the Eighth Amendment, a nurse would have received critical information about Ms. Rudolph's condition. A reasonable nurse then would have ordered a physician consult, and a reasonable physician would have likely started treatments that would have saved Ms. Rudolph's life. Expert testimony on each of these components of Plaintiff's theory is necessary and would undoubtedly assist the jury in understanding the evidence in this case. *See* Rule 702.

### A. Ms. Wild's testimony will assist the jury in determining whether Clay County acted with deliberate indifference.

Defendants incorrectly suggest that Plaintiff has alleged that the correctional officers were responsible for making medical decisions regarding Ms. Rudolph. (*See* Defs.' Br. at 11-13.) There is no claim that the correctional officers should have made or altered any component of the medical treatment plan. Instead, Plaintiff's claim focuses on the correctional officers' responsibility to monitor the condition of inmates and communicate relevant information to the medical staff. Ms. Wild's testimony is relevant to these claims.

Ms. Wild will testify that correctional healthcare is provided in a "team-based model" in which "medical professionals rely heavily on information provided to them by correctional officers." (Hiveley Dec., Ex. 3 at ¶ 63.) She will explain to the jury that Clay County had certain policies and procedures in place requiring correctional officers to monitor inmates with medical risks. (*Id.* at ¶ 65.) Specifically, the policies directed correctional officers to observe inmates for "signs and symptoms of possible serious illness [including] . . . [s]igns of alcohol or drug overdose or withdrawal." (*Id.* at ¶ 70.) Ms. Wild will further testify that "correctional officers are in the best possible position to observe the inmate's behavior and condition, listen to their concerns, and communicate any relevant health information to the medical professionals." (*Id.* at ¶ 65.) Finally, Ms. Wild will explain that "[c]ommunication is critical to ensure that inmates receive the healthcare services that they need." (*Id.* at ¶ 67.) All of this testimony is relevant to the jury's determination of whether the correctional officers acted with deliberate indifference to Ms. Rudolph's medical condition by failing to appropriately communicate with Nurse Pender.

13

### B. Ms. Wild's and Dr. Willenbring's testimony is relevant to whether Ms. Rudolph had an objectively serious medical need.

"To show deliberate indifference, plaintiffs must prove an objectively serious medical need." *Gordon ex rel. Gordon v. Frank*, 454 F.3d 858, 862 (8th Cir. 2006). Plaintiff alleges that Ms. Rudolph's objectively serious medical need was the need for treatment of her severe dehydration and hypernatremia during her acute drug withdrawal.[5] The correctional officers' failure to appropriately communicate with nursing staff resulted in a delay in that necessary treatment.

When a plaintiff claims that constitutional rights were violated by a delay in medical treatment, "the objective seriousness of the deprivation [is measured] by reference to the effect of the delay in treatment." *Laughlin v. Schriro*, 430 F.3d 927, 929 (8th Cir. 2005). To establish the effect of delayed treatment, the plaintiff "must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment" *Id.* Verifying medical evidence can take the form of expert testimony. *Coleman v. Rahija*, 114 F.3d 778, 785 (8th Cir. 1997).

Expert medical testimony is necessary to establish the effect of a delay in treatment of Ms. Rudolph's condition for at least two reasons. First, the jury will need expert testimony to understand how appropriate communication from the correctional officers would have led to earlier treatment. In order to understand this concept, they will need to hear expert testimony from a nurse and a physician. Ms. Wild will explain what a reasonable nurse would have done if she was provided the relevant information about Ms. Rudolph's condition—namely,

---

[5] While Defendants are correct that Ms. Rudolph's acute drug withdrawal was an objectively serious medical need that a layperson could recognize (Defs.' Br. at 14-15), expert testimony is nevertheless appropriate to help the jury understand the nature of this medical condition, including the associated dehydration and hypernatremia. It is also necessary for expert testimony to establish the effect of the delay of treatment of this condition.

14

order a physician consult. (Hiveley Dec., Ex. 3 at ¶ 81.) Dr. Willenbring will explain to the jury what a reasonable physician would have done if such a consult had been ordered for Ms. Rudolph. (Hiveley Dec., Ex. 4, ¶ 64-66). Dr. Willenbring will further explain the likely effect of a timely physician consultation, and what Ms. Rudolph's prognosis would have been if that consultation had been done. (*Id.* at 67-71.) All of this expert testimony is necessary to establish the effect of the delay, and all of it will assist the jury in understanding the evidence in this case.[6]

### C. All of Plaintiff's experts are necessary to establish the causal link between Defendants' conduct any Ms. Rudolph's death.

In order to prevail on the Eighth Amendment claims, Plaintiff must prove that the correctional officers' "unconstitutional actions in fact caused [Ms. Rudolph's] injuries." *Gibson v. Weber*, 433 F.3d 642, 646 (8th Cir. 2006). Because a death caused by untreated drug withdrawal is a "sophisticated injury," expert testimony is needed to establish this causal link. *See id; see also Robinson v. Hager*, 292 F.3d 560, 564 (8th Cir. 2002).

As explained in Section V.B above, the testimony of Ms. Wild and Dr. Willenbring is necessary to establish the chain of causation that would have been set in motion had the correctional officers appropriately communicated regarding Ms. Rudolph's condition. The actions of a reasonable nurse and reasonable physician caring for a patient with drug withdrawal are unquestionably issues upon which expert testimony is necessary.

---

[6]  Even if the Court agrees that expert testimony is not necessary to establish an objectively serious medical need, this would not be fatal to Plaintiff's claims because such a ruling would mean that the issue should be left for the jury to decide.

15

The final link in the chain of causation is the legal cause of Ms. Rudolph's death. "Dr. Willenbring will testify that if a reasonable physician became involved in Ms. Rudolph's care on November 1 or November 2, she more likely than not would have survived her withdrawal syndrome. The failure to involve a physician in her care played a substantial part in bringing about her death." (Hiveley Dec., Ex. 4 at ¶ 67.)

Dr. Sens' testimony is also needed to establish the chain of causation because the medical examiner who performed Ms. Rudolph's autopsy believed that she died of "pneumonia." Defendants will no doubt seize upon this medical record to claim that Ms. Rudolph's death was unrelated to her drug withdrawal, dehydration, and hypernatremia. If the jury were to believe this argument, Plaintiff's claims would fail due to a lack of legal causation. Accordingly, Plaintiff retained Dr. Sens to review the results of the autopsy and determine the most likely cause of Ms. Rudolph's death. (Hiveley Dec., Ex. 2 at ¶ 3.) Dr. Sens will testify to the jury that "the most likely cause of Ms. Rudolph's death was complications of clinically documented acute drug withdrawal" and the "pneumonia found at autopsy was an aspiration pneumonia related to vomiting, and was not a likely independent cause of her death." (*Id.* at ¶ 4.)

All of Plaintiffs experts are necessary to establish each link in the chain of causation in this case. Their opinions are therefore relevant to the issue of causation and should not be excluded.

VI. **Ms. Wild is qualified to testify regarding communication between correctional officers and medical personnel in the correctional healthcare setting.**

Defendants argue that Ms. Wild is not competent to testify regarding the conduct of the Clay County correctional officers. "The threshold question of

16

whether a witness is competent as an expert is solely for the trial judge, and, as the text of Rule 702 suggests, the central issue is whether the expert's testimony will assist the trier of fact." *Fox v. Dannenberg*, 906 F.2d 1253, 1256 (8th Cir. 1990). Any "doubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility." *Larabee v. M M & L Intern. Corp.*, 896 F.2d 1112, 1116 n. 6 (8th Cir.1990) (quoting J. Weinstein & M. Berger, Weinstein's Evidence, para. 702[02] at 702–30 (1988)). For the reasons explained in Section V above, Ms. Wild's testimony will assist the jury in this case.

Moreover, Ms. Wild is certainly competent to testify in this case. While it is true that Ms. Wild is not a correctional officer, she has practical experience regarding communication between correctional officers and nurses in the correctional healthcare setting. *See Fox*, 906 F.2d at 1256 (8th Cir. 1990) ("an individual can qualify as an expert where [s]he possesses sufficient knowledge gained from practical experience.") Ms. Wild's practical experience on the relevant issues in this case is extensive. She has over 30 years of experience working in a team-based model with correctional officers in county jails. (Hiveley Aff, Ex. 3 at ¶ 9.) Ms. Wild has trained correctional officers on how to appropriately monitor inmates and when to communicate information about a patient's health status. (*Id.* ¶ 8.) She has also specifically trained officers on monitoring and communication regarding inmates going through drug withdrawal. (*Id.*) Because of this practical experience, she is competent to explain to the jury the importance of communication between correctional officers and nurses.

In arguing that Ms. Wild is not competent to testify in this case, Defendants rely almost exclusively on a non-binding unpublished decision from the Western District of Louisiana. (*See* Defs.' Br. at 19-20 (discussing *Grafton v.*

17

*Bailey*, No. CV 13-2940, 2018 WL 2325410 (W.D. La. May 22, 2018).) In that case, the court ruled that Ms. Wild was not qualified to testify regarding the conduct of a correctional officer caring for an unresponsive patient suffering a medical emergency. *Grafton*, 2018 WL 2325410 at *5. Though it is not entirely clear from the decision, the court appears to have excluded the following opinion of Ms. Wild:

> The emergency response when Ms. Grafton was found unresponsive was well below the standard of care. CPR must be initiated immediately by the first responder. whether correctional officer or healthcare provider. Deputy Tate was certified as competent in CPR, and knew that once a patient's heart stopped it is critical to initiate resuscitative care within 3-4 minutes to avoid brain death.

Wilder Affidavit, ¶7 2017 WL 3091085 (W.D.La.).

In other words, the opinion in *Grafton* involved a failure of a correctional officer to perform CPR — a medical intervention. There is no evidence in *Grafton* that Ms. Wild has any experience training correctional officers in how to appropriately perform CPR, or that she works in a team-based model with correctional officers in providing CPR. Accordingly, *Grafton* can be distinguished on its facts because the issue in the present case is about the effectiveness of communications between nurses and correctional officers. The decision of the Western District of Louisiana is irrelevant, non-binding, and does not support exclusion of Ms. Wild's expert testimony in this case.

## VII. The testimony of Plaintiff's experts is sufficiently reliable and trustworthy to be presented to the jury.

Defendants' *Daubert* motion relies primarily on the argument that Plaintiff's experts could not have independently arrived at their conclusions because counsel assisted in typing their expert reports. This argument was addressed in Section II above and does not require further elaboration. The fact

18

that similar phraseology is used in portions of the affidavits does not suggest anything inappropriate or unreliable—it is perfectly reasonable for different experts to arrive at similar opinions about a certain subject. The fact that two experts come to similar conclusions should strengthen the reliability and trustworthiness of the reports.

As the expert reports make clear, the experts reviewed all of the information relevant to their opinions, then applied their education, training, and experience to formulate their opinions. (*See* Hiveley Dec., Ex. 2 at ¶ 6, Ex. 3 at ¶ 13, and Ex. 4 at ¶ 8.) On the third point of admissibility under Fed. R. Evid. 702, "the proposed testimony must be the product of reliable principles and methods, and the proposed expert witness must have applied the principles and methods reliably to the facts of the case." *Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.*, 829 F. Supp. 2d 802, 820 (D. Minn. 2011). The methodolofy followed in this case is that methodology that practicing healthcare providers engage in regularly, and it is the methodology that virtually every medical expert follows when acting as an expert witness. The expert opinions are sufficiently reliable to assist the jury in deciding the critical issues in this case.

## Conclusion

The testimony of Plaintiff's expert witness is essential to the claims in this case. The testimony will help the jury understand how Abby Rudolph died, and decide whether the Clay County correctional officers are to blame for her tragic death. The opinion testimony was disclosed several months ago and there would be no prejudice to Defendants if the experts were allowed to testify consistent with those disclosures. Defendants Motion should be denied, and the jury should be allowed to consider this critical evidence.

| | |
|---|---|
| Dated: December 2, 2019 | **CIRESI CONLIN LLP** |
| | By: /s/ Colin F. Peterson |
| |     Colin F. Peterson (#392414) |
| |     Brandon Thompson (#349173) |
| |     *CFP@CiresiConlin.com* |
| |     *BET@CiresiCOnlin.com* |
| | 225 South Sixth Street |
| | Suite 4600 |
| | Minneapolis, MN  55402 |
| | 612-361-8200 |
| In Association with: | **BENNEROTTE & ASSOCIATES, P.A.** |
| | Vincent J. Moccio (#184640) |
| | *vincent@ bennerotte.com* |
| | 3085 Justice Way, Suite 200 |
| | Eagan, Minnesota 55121 |
| | 651-842-9257 |
| | **ATTORNEYS FOR PLAINTIFF** |