## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Craig Casler,                                          Case No. 18-cv-1020 (WMW/LIB)

                    Plaintiff,

                                                       **ORDER AND**
v.                                             **REPORT AND RECOMMENDATION**

MEnD Correctional Care, PLLC, et al.,

                    Defendants.

____

This matter comes before the undersigned United States Magistrate Judge upon Defendants' Motion for Summary Judgment, [Docket No. 55], and Defendants' Motion to Exclude Expert Testimony. [Docket No. 68]. Defendants' Motions were referred to the undersigned by the Honorable Wilhelmina M. Wright. (Text Only Order [Docket No. 83]). After conducting a hearing on the present Motions, the undersigned took the parties' Motions under advisement on September 9, 2020. [Docket No. 88].

For the reasons discussed herein, Defendants' Motion to Exclude Expert Testimony, [Docket No. 55], is **DENIED**.

Further, for the reasons discussed herein, the undersigned recommends that Defendants' Motion for Summary Judgment, [Docket No. 55], be **GRANTED in part and DENIED in part**.

## I.    Procedural History

The present action, brought pursuant to 42 U.S.C. § 1983, arises out the November 3, 2016, death of Abby Rudolph while she was detained at the Clay County jail in Clay County, Minnesota.

On April 16, 2018, Plaintiff Jill Rudolph, as trustee for the heirs and next of kin of Abby Rudolph, brought the present wrongful death action. (Amended Compl. [Docket No. 2]).

Plaintiff's Amended Complaint, [Docket No. 2], named the following Defendants: MEnD Correctional Care, PLLC; Michelle Pender; Clay County, Minnesota; Julie Savat; Justin Roberts; Raynor Blum; Nancy Livingood; Ashley Johnson; Tiffany Larson; Deborah Benson; Jana Bartness; Ryan Magnuson; Anastacia Hermes; Joel Torkelson; Anthony Hanson; Amber Nelson; Cassie Olson; Devin Lien; Richard Stetz; Brianna Then; Amy Rood; Lucas Heck; and Kari-White-Tuton. Each of the individually named Defendants is sued in their individual and official capacity.

On February 13, 2019, Craig Casler was substituted as the trustee in the present action following the death of Jill Rudolph. (Order [Docket No. 27]).

On July 9, 2019, Plaintiff informed the Court that he had reached a settlement with Defendant Nurse Pender and Defendant MEnD Correctional Care. Following this settlement, only the Clay County Defendants and the claims against them remain. (Order [Docket No. 52]).

Plaintiff's Amended Complaint alleges five Counts against the Clay County Defendants. (Amended Compl. [Docket No. 2]). Count I alleges a Denial of Due Process Right to Adequate Medical Care claim against all Defendants except Defendant Clay County. Count II alleges a Denial of Due Process Right to Life claim against all Defendants except Defendant Clay County. Count III alleges a Denial of Due Process Right to Adequate Medical Care claim against Defendant Clay County. Count IV alleges a Denial of Due Process Right to Life claim against Defendant Clay County. Lastly, County V alleges a Failure to Train claim against Defendant Clay County and Defendant Savat.

2

II.   **Defendants' Motion to Exclude Testimony by Plaintiff's Experts Mark Willenbring, Katheryn Wild, and Mary Sens. [Docket No. 68].**

On November 8, 2019, Defendants filed their motion to exclude Plaintiff's experts. [Docket No. 68]. Defendants seek an Order of this Court excluding Plaintiff's expert witnesses, Mark Willenbring, Kathryn Wild, and Mary Sens. (Id.).

Defendants' motion to exclude Plaintiff's experts, [Docket No. 68], purports to include non-dispositive procedural challenges, as well as, dispositive challenges brought under Federal Rule of Evidence 702 and Daubert. (See, Id.; see also, Mem. in Supp. [Docket No. 70]). However, any dispositive challenges to admissibility brought by Defendants under Rule 702 and Daubert are premature here.

Nowhere in Defendants' Motion for Summary Judgment, [Docket No. 55], do Defendants argue that they are entitled to summary judgment because if their motion to exclude Plaintiff's experts, [Docket No. 68], is granted, the lack of experts would preclude Plaintiff from making out a prima facie case due to expert testimony being required as an essential element of their claims. Rather, Defendants' only argument for summary judgment is on grounds of qualified immunity. (See, e.g., Mem. in Supp., [Docket No. 70]). Thus, it is not the proper time for dispositive Federal Rule of Evidence 702 and Daubert challenges to admissibility. Such challenges may be raised by Defendants, if they so choose, in the context of a later motion in limine before the Trial Judge.

Accordingly, Defendants' challenges in their present motion to exclude Plaintiff's experts, [Docket No. 68], are in actuality purely procedural.

A.  **Material Facts**

On March 14, 2019, this Court issued an Amended Pretrial Scheduling Order. [Docket No. 39]. Pursuant to the Amended Pretrial Scheduling Order, Plaintiff's Rule 26(a)(2)(B) expert

disclosures were to be made on or before May 10, 2019, and Defendants' disclosures were to be made on or before July 9, 2019. (Am. Pretrial Scheduling Order, [Docket No. 39], at 4–5). Also pursuant to the Amended Pretrial Scheduling Order, the discovery period terminated on September 9, 2019, and the heard-by deadline for non-dispositive motions was October 9, 2019. (Id. at 2–3).

On May 8, 2019, Plaintiff served 3 affidavits on Defendants via U.S. Mail: (1) Minn. Stat. § 145.682 Affidavit Identifying Mary Ann Sens, M.D., Ph.D.; (2) Minn. Stat. § 145.682 Affidavit Identifying Kathryn J. Wild, RN, MPA, CCHP-RN; and (3) Minn. Stat. § 145.682 Affidavit Identifying Mark Leon Willenbring, M.D. (together, the "Affidavits"). (Ex. A, [Docket No. 78-1]; see also, Exs. 1–4, [Docket Nos. 71-1; 71-2; 71-3; 71-4]). The process by which the Affidavits were created was that copies of the relevant medical and correctional records were sent to each expert, the experts reviewed those documents, and the experts subsequently shared their opinions with Plaintiff's counsel via telephone. (Peterson Decl., [Docket No. 78], ¶ 2). Plaintiff's counsel then typed the Affidavits, sent them to the experts, the experts reviewed the Affidavits, and the experts signed the Affidavits after verifying that they fully and accurately expressed their expert opinions. (Id.).

The Affidavit identifying Mary Ann Sens, M.D., Ph.D. was written by Plaintiff's counsel in the described manner, and it states that Plaintiff intends to call Dr. Sens as an expert in this case. (Ex. 2, [Docket No. 71-2], ¶¶ 1–2). The Affidavit states that Dr. Sens is a forensic pathologist, and it provides a brief description of Dr. Sens' qualifications. (Id. ¶ 2). A detailed listing of Dr. Sens' qualifications and publications is attached to the Affidavit. (Ex. 2, [Docket No. 71-2], at 10–35).

4

The Affidavit further states that Dr. Sens reviewed the information regarding Ms. Rudolph's condition while in the Clay County Jail, as well as, the results of her autopsy, and in Dr. Sens' opinion, which she will testify to at the trial, Ms. Rudolph's death was caused by acute drug withdrawal. (Ex. 2, [Docket No. 71-2], ¶¶ 4, 6). And the Affidavit states that "Dr. Sens has specifically been informed of, and has agreed to abide by, the legal definition of causation that applies to the negligence cases in Minnesota." (Id. ¶ 5).

In addition, the Affidavit provides a recitation of facts upon which Dr. Sens' opinion is based. (Id. at ¶¶ 7–18). And the Affidavit provides a detailed summary of Dr. Sens' opinions and what she will testify to at trial regarding the cause of Ms. Rudolph's death. (Id. ¶¶ 19–31).

The Affidavit was signed by Plaintiff's counsel, but a notarized "verification" was also signed by Dr. Sens which states: "I have read the foregoing, and agree that it accurately provides the substance of the facts and opinions to which I will testify in this matter, as well as a summary of the grounds for each opinion." (Id. at 8–9).

Similarly, the Affidavit identifying Kathryn J. Wild, RN, MPA, CCHP-RN was written by Plaintiff's counsel in the described manner, and it states that Plaintiff intends to call Ms. Wild as an expert in this case. (Ex. 3, [Docket No. 71-3], ¶¶ 1–2). The Affidavit states that Ms. Wild has worked in the correctional health care field for over 30 years, and it provides a brief description of Ms. Wild's qualifications. (Id. ¶¶ 2, 9–10). A detailed listing of Ms. Wild's qualifications and publications is attached to the Affidavit. (Ex. 3, [Docket No. 71-3], at 17–20).

The Affidavit further states that Ms. Wild reviewed the conduct of the correctional officers, and in Ms. Wild's opinion, which she will testify to at the trial, "the monitoring and care provided by the correctional officers at Clay County Jail departed from the standards of reasonable care," as well as, "that the departures from the standards of reasonable care by the

correctional officers played a substantial part in preventing Ms. Rudolph from receiving the care and treatment that she needed to save her life." (Ex. 3, [Docket No. 71-3], ¶¶ 4, 6). And the Affidavit states that "Ms. Wild has specifically been informed of, and has agreed to abide by, the legal definition of negligence that applies to negligence cases in Minnesota." (Id. ¶ 5).

In addition, the Affidavit provides a recitation of facts upon which Ms. Wild's opinion is based. (Id. at ¶¶ 14–50). And the Affidavit provides a detailed summary of Ms. Wild's opinions and what she will testify to at trial regarding various topics. (Id. ¶¶ 51–81).

The Affidavit was signed by Plaintiff's counsel, but a notarized "verification" was also signed by Ms. Wild which states: "I have read the foregoing, and agree that it accurately provides the substance of the facts and opinions to which I will testify in this matter, as well as a summary of the grounds for each opinion." (Id. at 15–16).

Likewise, the Affidavit identifying Mark Leon Willenbring, M.D. was written by Plaintiff's counsel in the described manner, and it states that Plaintiff intends to call Dr. Willenbring as an expert in this case. (Ex. 4, [Docket No. 71-4], ¶¶ 1–2). The Affidavit states that Dr. Willenbring is an addiction psychiatrist, and it provides a brief description of Dr. Willenbring's qualifications. (Id. ¶¶ 2, 6). A detailed listing of Dr. Willenbring's qualifications and publications is attached to the Affidavit. (Ex. 3, [Docket No. 71-4], at 15–48).

The Affidavit further states that Dr. Willenbring reviewed the addiction medicine issues in this case, and in Dr. Willenbring's opinion, which he will testify to at the trial, "the failure to involve a physician in Ms. Rudolph's care played a substantial part in preventing her from receiving the care and treatment she needed to save her life." (Ex. 4, [Docket No. 71-4], ¶ 5). And the Affidavit states that "Dr. Willenbring has specifically been informed of, and has agreed

6

to abide by, the legal definition of causation that applies to the negligence cases in Minnesota." (Id. ¶ 7).

In addition, the Affidavit provides a recitation of facts upon which Dr. Willenbring's opinion is based. (Id. at ¶¶ 9–48). And the Affidavit provides a detailed summary of Dr. Willenbring's opinions and what he will testify to at trial regarding various topics (Id. ¶¶ 49–71).

The Affidavit was signed by Plaintiff's counsel, but a notarized "verification" was also signed by Dr. Willenbring which states: "I have read the foregoing, and agree that it accurately provides the substance of the facts and opinions to which I will testify in this matter, as well as a summary of the grounds for each opinion." (Id. at 13–14).

On August 9, 2019, Plaintiff's counsel communicated via email with defense counsel and, in part, inquired into the status of Defendants' expert disclosures which were due July 9, 2019, but had not been received by Plaintiff. (Ex. 5, [Docket No. 71-5], at 5). The same day, defense counsel stated "Defendants did not disclose any experts because we did not receive any disclosures to rebut. As you know, Plaintiffs did not disclose any experts under Rule 26(a)(2)." (Id. at 4). Plaintiff's counsel replied that Plaintiff's expert disclosures had been served on May 8, 2019, and asked if those disclosures were deficient. (Id. at 3). Defense counsel responded that the documents served on May 8, 2019, were Minn. Stat. § 145.682 Affidavits as required in reference to the medical malpractice claim, listed several reasons why they were deficient under Federal Rule of Civil Procedure 26(a)(2), and indicated that Defendants would be open to discussing a modification to the scheduling order so that Plaintiff could serve proper expert reports. (Id. at 2–3). Plaintiff's counsel responded by stating that they disagreed on what the rules require, but that Plaintiff would supplement Ms. Wild's report to include her previous testimony and compensation. (Id. at 2).

On August 19, 2019, Plaintiff served the Rule 26(e) Declaration of Colin F. Peterson and the Rule 26(e) Declaration of Kathryn J. Wild, RN, MPA, CCHP-RN via U.S. mail. (Ex. D, [Docket No. 78-1], at 18). Attached to the Rule 26(e) Declaration of Colin F. Peterson were supplemental documents to the Affidavits regarding Dr. Sens and Dr. Willenbring. (Ex. E, [Docket No. 78-1], at 20–31). The supplemental documents provided lists of the cases in which Dr. Sens or Dr. Willenbring had testified as an expert at trial or by deposition within the prior 4 years and documents that indicated the compensation to be paid by Plaintiff to Dr. Sens and Dr. Willenbring in this case. (Id.).

In the Rule 26(e) Declaration of Kathryn J. Wild, RN, MPA, CCHP-RN, Ms. Wild purported to supplement her opinion described the May 8, 2019, Affidavit by declaring that she had been informed of, and agreed to abide by, "the legal definition of 'deliberate indifference' that applies to the claims against the correctional officers at Clay County Jail," and that, in her opinion, "the correction officers' departures from accepted standards of reasonable care—as detailed in the [May 8, 2019] Report—demonstrated deliberate indifference." (Ex. F, [Docket No. 78-1], at 34).

Attached to the Rule 26(e) Declaration of Kathryn J. Wild, RN, MPA, CCHP-RN were supplemental documents to the May 8, 2019, Affidavit, and a copy of the Affidavit itself. (Id. at 37–61). The supplemental documents provided a list of cases in which Ms. Wild had testified as an expert at trial or by deposition within the prior 4 years, and the supplemental documents indicated the compensation paid by Plaintiff to Ms. Wild in this case. (Id. at 35, 57–61).

On September 19, 2019, defense counsel sent an email to Plaintiff's counsel stating that Defendants did not believe the Affidavits met the requirements of the federal rules and that Defendants intended to file a motion to exclude the expert opinions. (Ex. 6 [Docket No. 71-6]).

8

However, Defendants also proposed, in the alternative, that the Parties discuss the issue informally with this Court and attempt to resolve the matter by extending the expert disclosure deadlines. (Ex. 6 [Docket No. 71-6]). On September 28, 2019, Plaintiff's counsel responded via email and stated that Defendants already knew Plaintiff's position on his expert disclosures, but Plaintiff agreed to extend Defendants' expert disclosure deadlines to accommodate a response. (Ex. G, [Docket No. 98-1], at 64). Plaintiff's counsel also stated that he was in the middle of a trial, and he requested that defense counsel draft a stipulation. (Id.). On October 3, 2019, Plaintiff sent a follow-up email. (Id. at 63). On October 7, 2019, Defense counsel responded by simply stating that the deadline to file non-dispositive motions was September 25, 2019. (Id. at 66).

### B.  Standard of Review

Pursuant to Federal Rule of Civil Procedure 26(a)(2), "a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." Fed. R. Civ. P. 26(a)(2)(A).

> Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report—prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony. The report must contain:
>
> **(i)** a complete statement of all opinions the witness will express and the basis and reasons for them;
>
> **(ii)** the facts or data considered by the witness in forming them;
>
> **(iii)** any exhibits that will be used to summarize or support them;
>
> **(iv)** the witness's qualifications, including a list of all publications authored in the previous 10 years;
>
> **(v)** a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and

> **(vi)** a statement of the compensation to be paid for the study and testimony in the case.

Fed. R. Civ. P. 26(a)(2)(B).

"A party must disclose expert opinions 'at the times and in the sequence that the Court orders.'" U.S. v. Stable, Inc., 800 F.3d 476, 487 (8th Cir. 2015) (quoting Fed. R. Civ. P. 26(a)(2)(D)). Further, "[u]nder Rule 26(e), a party has a duty to supplement disclosed information 'in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect.'" Id. (quoting Fed. R. Civ. P. 26(e)(1)(A)). Supplemental disclosures "may update a previously disclosed assessment based on additional information," but "[a] supplemental report must not materially alter an expert's original report." City of Mankato, Minn. v. Kimberly-Clark Corp., No. 15-2101 (JRT/TNL), 2019 WL 4897191, at *4 (D. Minn. May 28, 2019) (quotations omitted).

"The disclosure mandates in Rule 26 are given teeth by the threat of sanctions in Rule 37." Vanderberg v. Petco Animal Supply Stores, Inc., 906 F.3d 698, 702 (8th Cir. 2018). Pursuant to Federal Rule of Civil Procedure 37(c)(1):

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
>
> (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;
>
> (B) may inform the jury of the party's failure; and
>
> (C) may impose other appropriate sanctions including any of the orders listed in Rule 37(b)(2)(A)(i)–(vi).

Fed. R. Civ. P. 37(c)(1). "In other words, if a party does not satisfy the expert disclosure requirements in Rule 26(a)(2), the undisclosed information or expert is excluded unless the

failure was substantially justified or harmless. However, the district court may, on a party's motion, impose an additional or alternative sanction." Vanderberg, 906 F.3d at 703. "[F]ailure to disclose in a timely manner is equivalent to failure to disclose . . . ." Trost v. Trek Bicycle Corp., 162 F.3d 1004, 1008 (8th Cir. 1998).

### C.   Analysis

Defendants argue that Plaintiff's Affidavits do not satisfy the requirements of Federal Rule of Civil Procedure 26(a)(2), and therefore, Defendants contend that Plaintiff did not timely disclose any expert witness opinions pursuant to the timeline in the Amended Pretrial Scheduling Order. [Docket No. 38]. Specifically, Defendants contend that the Affidavits do not qualify as written reports under Rule 26(a)(2)(B) because they were not "prepared and signed by the witness[es]." (Mem. in Supp., [Docket No. 70], at 7–10).

Pursuant to Rule 26(a)(2), "a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703 or 705." Fed. R. Civ. P. 26(a)(2)(A). For expert witnesses "retained or specially employed to provide expert testimony," then "this disclosure must be accompanied by a written report" that was "prepared and signed by the witness." Fed. R. Civ. P. 26(a)(2)(B). However, "Rule 26(a)(2)(B) does not preclude counsel from providing assistance to experts in preparing the reports." Fed. R. Civ. P. 26 Advisory Committee's Notes, 1993 Amendments. "Nevertheless, the report, which is intended to set forth the substance of the direct examination, should be written in a manner that reflects the testimony to be given by the witness and it must be signed by the witness." Id.

Other courts have found that where an expert participated in the preparation of a Rule 26(a)(2)(B) written report and the substance of the report reflects the expert's opinions, the "prepared by" requirement of Rule 26(a)(2)(B) was met despite significant assistance from

counsel in preparing the reports. See, e.g., Zoch v. Daimler, A.G., No. 4:17-cv-578, 2018 WL 4610569, at *9 (E.D. Tex. Sept. 25, 2018) (denying motion where the "substance of the opinion" was from the expert); Kenall Mfg. Co. v. Genlyte Thomas Grp. LLC, 413 F. Supp. 2d 937, 943 (N.D. Ill. 2006) (denying motion where the expert reviewed material and conveyed opinion to counsel, then reviewed the report after counsel drafted it and requested further changes be made); Estate of LaFarge ex rel. Blizzard v. Kyker, No. 1:08-cv-185, 2011 WL 6151595, at *7 (N.D. Miss. Dec. 12, 2011) (denying motion where the court found "no basis for concluding [the expert witness] did not substantially participate in the preparation of his report"); SL Montevideo Tech., Inc. v. Eaton Aerospace, LLC, No. 03-cv-3302 (RHL/FLN), 2005 WL 1923811, at *6 (D. Minn. Aug. 11, 2005) ("While counsel here may have assisted in the preparation of the reports . . . the Court cannot find that those opinions do not reflect the testimony to be given by the witnesses.").

However, when a Rule 26(a)(2)(B) written report is prepared entirely by counsel without any participation from the expert and the substance of the report reflects counsel's opinions, the "prepared by" requirement of Rule 26(a)(2)(B) is not met despite the report being signed by the expert. See, e.g., Newsome v. Tull, No. 18-cv-0197-HE, 2019 WL 5197566, at *3 (W.D. Okla. August 6, 2019) (granting motion where the expert did not "substantially participate" in the preparation of his report and the opinions therein were those of counsel); Batiste v. Lewis, No. 17-cv-4435, 2019 WL 1552843, at *2–3 (E.D. La. Apr. 10, 2019) (granting motion where all analysis came from counsel not the expert and the expert was unable to verify accuracy because he did not possess the computer programs to do so); Kenall Mfg. Co., 413 F. Supp. at 943 (quoting Manning v. Crockett, No. 95-cv-3117, 1999 WL 342715, at *3 (N.D. Ill. May 18, 1999)) (alterations in original) ("Although Rule 26 does not prohibit a party's attorney from

providing assistance to the expert, '[p]reparation implies [an expert's] involvement other than perusing a report drafted by someone else and signing one's name at the bottom to signify agreement.'"). But see, Maxson v. Calder Bros. Corp., No. 4:14-cv-1360 AGF, 2015 WL 4715955, at *3 (E.D. Mo. Aug. 7, 2015) ("Thus, generally, when an expert reads and signs a report prepared by counsel, the report is viewed as the expert's."); Abernathy v. Union Pac. R.R. Co., No. 4:08-cv-04187 BRW, 2011 WL 1397439, at *5 (E.D. Ark. Apr. 13, 2011) ("Here, [the expert] adopted the report as his own by approving and signing it."). The burden is on the party seeking exclusion to show a lack of participation and that the substance of a report does not reflect the opinions of the expert. See, e.g. Batiste v. Lewis, 2019 WL 1552843, at *2.

Here, Plaintiff has described to the Court the process by which the Affidavits were created. First, copies of the relevant medical and correctional records were sent to each expert, and the experts reviewed those documents. (Peterson Decl., [Docket No. 78], ¶ 2). Then the experts shared their opinions with Plaintiff's counsel via telephone. (Id.). Afterwards, Plaintiff's counsel typed the Affidavits and sent them to the experts. (Id.). After reviewing the Affidavits and verifying their accuracy, the experts each signed a verification which stated that the relevant Affidavit "accurately provide[d] the substance of the facts and opinions to which [that expert] will testify in this matter, as well as a summary of the grounds for each opinion." (Id.; see also, Ex. 2, [Docket No. 71-2], at 9; Ex. 3, [Docket No. 71-3], at 16; Ex. 4, [Docket No. 71-4], at 14). As evidence of this process, Plaintiff has submitted invoices for the experts' services in relation to preparing the Affidavits. (Exs. H–J, [Docket No. 78-1], at 65–72).

Defendants have not pointed to any evidence in the present record that indicates the Affidavits were created by any other method than the one described above. Defendants merely contend that because the Affidavits were typed and signed by Plaintiff's counsel, the Affidavits

do not meet the "prepared and signed by" requirement of Rule 26(a)(2)(B), and the Affidavits do not represent the expert's opinions. (See, Mem. in Supp., [Docket No. 70], at 7–8; Reply, [Docket No. 80], at 11–12). Defendants do not acknowledge the role the experts played in creating the Affidavits, nor do Defendants' even acknowledge the verifications, attached to each Affidavit, that were signed by the experts.[1] The only evidence that Defendants point to in support of their contention that the Affidavits do not represent the opinions of the expert, is that a small portion of the Affidavits identifying Ms. Wild and Dr. Willenbring, which describes the symptoms of heroine withdrawal, is nearly identical in both Affidavits. (Reply, [Docket No. 80], at 11–12) (citing Ex. 3, [Docket No. 71-3], ¶¶ 55–60; Ex. 4, [Docket No. 71-4], ¶¶ 51–56). However, this Court cannot conclude that simply because the Affidavits may be similar in parts, they do not represent the expert's opinions. When viewed as a whole, the Affidavits are clearly each unique.

Therefore, this Court finds that the Affidavits were "prepared and signed by" the expert witnesses as required by Federal Rule of Civil Procedure 26(a)(2)(B). See, e.g., Fed. R. Civ. P. 26 Advisory Committee's Notes, 1993 Amendments; Zoch, 2018 WL 4610569, at *9; Kenall Mfg. Co., 413 F. Supp. 2d at 943; Estate of LaFarge ex rel. Blizzard, 2011 WL 6151595, at *7; SL Montevideo Tech., Inc., 2005 WL 1923811, at *6.

In addition to requiring that a written report be prepared and signed by the expert witness, to satisfy the requirements of Rule 26(a)(2)(B) a report must contain: (1) "a complete statement of all opinions the witness will express and the basis and reasons for them;" (2) "the facts or data

---

[1] Defendants cite to a single case, Kenall Mfg. Co., in support of their contention that the Affidavits do not meet the "prepared and signed by" requirement. (Mem. in Supp., [Docket No. 70], at 8). In Kenall Mfg. Co., the plaintiff provided evidence indicating that its expert had taken 8 pages of notes about a disputed patent, spoken with counsel for 1.5 hours before counsel drafted an expert report, spent 3 hours reviewing the report, and subsequently requested that changes be made to the report. 413 F. Supp. 2d at 943. The Court concluded that it could not exclude the possibility that the report reflected the expert's opinions, and the Court denied the motion to strike. Id.

considered by the witness in forming them;" (3) "any exhibits that will be used to summarize or support them;" (4) "the witness's qualifications, including a list of all publications authored in the previous 10 years;" (5) "a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition;" and (6) "a statement of the compensation to be paid for the study and testimony in the case." Fed. R. Civ. P. 26(a)(2)(B).

The Affidavits include a detailed summary of the opinions that each expert will testify to and the basis for such opinions, a statement of facts upon which each opinion is based, and a listing of each experts' qualifications and publications. (Exs. 2–4 [Docket No. 71-2, 71-3, 71-4]). The Affidavits do not include a list of cases in which each expert has testified at trial or by deposition within the prior 4 years, nor do the Affidavits include a statement of the compensation each expert is to be paid in reference to this case. (See, Id.). However, on August 19, 2019, Plaintiff provided supplemental documents, pursuant to Rule 26(e), to Defendants which contained this required information. (See, Ex. D, [Docket No. 78-1], at 18; Ex. E, [Docket No. 78-1], at 20–31; Ex. F, [Docket No. 78-1], at 57–61).

Therefore, this Court finds that the Affidavits sufficiently comply with the requirements of Federal Rule of Civil Procedure 26(a)(2)(B), and the Affidavits satisfy Plaintiff's obligation to provide written expert reports.

Plaintiff's expert disclosures were required to be made on or before May 10, 2019. (Am. Pretrial Scheduling Order, [Docket No. 39], at 4–5). On May 8, 2019, before the deadline, Plaintiff served the Affidavits on Defendants via U.S. Mail. (Ex. A, [Docket No. 78-1]; see also, Exs. 1–4, [Docket Nos. 71-1; 71-2; 71-3; 71-4]). But Plaintiff did not serve the supplemental documents until after the deadline on August 19, 2019. (Ex. D, [Docket No. 78-1], at 18; see also, Ex. E, [Docket No. 78-1], at 20–31; Ex. F, [Docket No. 78-1], at 57–61). Nevertheless, as

explained below, the Court finds that any technical failure by Plaintiff to provide some information to Defendants by the deadline was harmless.

"When a party fails to provide information or identify a witness in compliance with Rule 26(a) or (e), the district court has wide discretion to fashion a remedy or sanction as appropriate for the particular circumstances of the case." Wagener v. Johnson, 527 F.3d 687, 692 (8th Cir. 2008). The district court may exclude the information or testimony as a self-executing sanction unless the party's failure to comply is substantially justified or harmless. Id. Several factors are considered to determine whether a failure to comply is harmless, including: "(1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness." Roderick v. Wal-Mart Stores E., L.P., 666 F.3d 1093, 1097 (8th Cir. 2012). However, "the court need not make explicit findings concerning the existence of a substantial justification or the harmlessness." Id.

Defendants contend that they have been prejudiced in two ways. First, Defendants contend that because the Affidavits were prepared by Plaintiff's counsel, they "are bound to be surprised by the true opinions of the identified experts." (Mem. in Supp., [Docket No. 70], at 8–9). However, as explained above, Plaintiff's experts each verified that the relevant Affidavit accurately reflects their opinions to which they will testify at trial. (Ex. 2, [Docket No. 71-2], at 9; Ex. 3, [Docket No. 71-3], at 16; Ex. 4, [Docket No. 71-4], at 14). Nothing in the record presently before this Court indicates in any way that the Affidavits do not reflect the true opinions of the experts.

The Affidavits disclosed the substance of the experts' opinions, as well as, the basis for those opinions on May 8, 2019, before the deadline to provide expert disclosures set forth in the

Amended Pretrial Scheduling Order. After Defendants informed Plaintiff for the first time on August 9, 2019, that the Affidavits did not disclose the previous cases the experts had testified in and the compensation the experts were to receive for their services in this case, Plaintiff promptly compiled the missing information and provided it to Defendants on August 19, 2019. (Ex. 5, [Docket No. 71-5], at 2–3; Ex. D, [Docket No. 78-1], at 18; Ex. E, [Docket No. 78-1], at 20–31; Ex. F, [Docket No. 78-1], at 57–61). Moreover, at the Motions Hearing on this matter, Plaintiff's counsel represented to this Court on the record that the experts' testimony will "absolutely" be bound to those opinions disclosed within the 4 corners of the Affidavits. (Sept. 9, 2020, Motions Hearing, Digital Record at 2:14 p.m.).

Accordingly, this Court finds that Defendants will not be "surprised" by the opinions of Plaintiff's experts with one exception. The August 19, 2019, Rule 26(e) Declaration of Kathryn J. Wild, RN, MPA, CCHP-RN, purported to materially alter her opinion as it was disclosed in the May 8, 2019, Affidavit. (See, Ex. F, [Docket No. 78-1], at 34). Specifically, Ms. Wild sought to materially alter her previously disclosed opinion to reflect that she had been informed of, and agreed to abide by, "the legal definition of 'deliberate indifference' that applies to the claims against the correctional officers at Clay County Jail," and that, in her opinion, "the correction officers' departures from accepted standards of reasonable care—as detailed in the [May 8, 2019, Affidavit]—demonstrated deliberate indifference." (Ex. F, [Docket No. 78-1], at 34). This material alteration was improper. See, e.g., City of Mankato, Minn., 2019 WL 4897191, at *4 ("A supplemental report must not materially alter an expert's original report."). Therefore, Ms. Wild's expert testimony shall be restricted to only those opinions which were disclosed in the original, May 8, 2019, Affidavit.

Second, Defendants assert that because the Affidavits were misleadingly captioned as Minn. Stat. § 145.682 Affidavits, Defendants were not aware that the Affidavits were meant to be expert reports as required by Rule 26(a)(2)(B) until August 9, 2019, one month after Defendants were required to make disclosures regarding their experts. (Mem. in Supp., [Docket No. 70], at 9). Thus, Defendants contend that they have been prejudiced because they were "deprived of the opportunity" to retain their own responsive experts. (Id.).

However, any such prejudice can easily be cured by allowing Defendants time to obtain responsive experts. Indeed, at the Motions Hearing on this matter, Defendants acknowledged that this would be the least draconian remedy to cure such prejudice, and Defendants requested that they be allowed to retain responsive experts if Plaintiff's experts are not excluded. (Sept. 9, 2020, Motions Hearing, Digital Record at 2:05 p.m.–2:06 p.m.).

As such, this Court finds that the appropriate remedy to cure any prejudice to Defendants caused by the captions of the Affidavits is to allow Defendants 21 days from the date of this Order to retain responsive experts and to serve appropriate disclosures on Plaintiff as required by the Federal Rules of Civil Procedure and the operative Pretrial Scheduling Order in this case. See, e.g., Wegener, 527 F.3d at 692 (explaining that "the exclusion of evidence is a harsh penalty and should be used sparingly"); Fox v. Studebaker-Worthington, Inc., 516 F.2d 989, 996 (8th Cir. 1975) ("[t]here is a strong policy favoring a trial on the merits and against depriving a party of his day in court").

In conclusion, this Court finds that on the present record, the May 8, 2019, Affidavits complied sufficiently with the requirements of Federal Rule 26(a)(2)(B) and were therefore timely. Any technical failure by Plaintiff to provide some information to Defendants in the Affidavits was promptly remedied by Plaintiff's Rule 26(e) supplemental disclosures and thus

was harmless. However, Ms. Wild's late-disclosed, August 19, 2019, opinion which sought to materially alter her original opinion as it was disclosed in the May 8, 2019, Affidavit was improper. Consequently, Ms. Wild's expert testimony shall be limited to only those opinions which were disclosed in the original, May 8, 2019, Affidavit. In addition, Defendants shall be allowed 21 days from the date of this Order to retain responsive experts, if they so choose, and to serve appropriate disclosures on Plaintiff.

Accordingly, Defendants' Motion to Exclude Testimony by Plaintiff's Experts Mark Willenbring, Kathryn Wild, and Mary Sens, [Docket No. 68], is **DENIED**.[2]

## III.  Defendants' Motion for Summary Judgment. [Docket No. 55].

The Clay County Defendants move this Court for an Order dismissing all of Plaintiff's claims as alleged against them. Defendants argue that Plaintiff's claims should be dismissed because the individually named Defendants are entitled to qualified immunity. Defendants assert that they are entitled to qualified immunity because Plaintiff has failed to establish that any constitutional violation occurred and because Plaintiff has failed to demonstrate any clearly established constitutional right.

### A.  Plaintiff's Purported Voluntary Dismissal

In his memorandum in opposition to the present Motion and at the September 9, 2020, Motions Hearing, Plaintiff purported to voluntarily dismiss several Defendants. (Plf.'s Mem., [Docket No. 75], at 31–32, 41; September 9, 2020, Motions Hearing, Digital Record at 3:14 p.m.–3:16 p.m.). Specifically, Plaintiff asserted that he does not contest that Defendants Savat, Rood, Magnuson, Nelson, Blum, Livingood, Johnson, Hermes, Stetz, Then, White-Tutton, Torkelson, Larson, and Roberts "should be dismissed from this action." (Plf.'s Mem., [Docket

---

[2] This is a non-dispositive, procedural ruling only. The parties' arguments regarding helpfulness to the jury, relevance, and the experts' qualifications (i.e., the parties' Federal Rule of Evidence 702 and Daubert challenges) are premature and, if the parties so choose, should be made as part of properly and timely filed motions in limine.

No. 75], at 31–32; September 9, 2020, Motions Hearing, Digital Record at 3:14 p.m.–3:16 p.m.). Plaintiff also asserted that he purportedly "dismisses his <u>Monell</u> claims" against Defendant Clay County. (Defs.' Mem., [Docket No. 75], at 41; <u>see</u>, September 9, 2020, Motions Hearing, Digital Record at 3:14 p.m.–3:16 p.m.).

In their reply memorandum, Defendant accept Plaintiff's voluntary dismissal of certain claims and Defendants. (Defs.' Mem., [Docket No. 79], at 1 n.1).

Although Plaintiff purports to voluntarily dismiss several Defendants, he is not permitted to do so because of the procedural posture of the present case. Rule 41 of the Federal Rules of Civil Procedure provides that a plaintiff may voluntarily dismiss an action without a Court Order by filing either "a notice of dismissal <u>before the opposing party serves either an answer or a motion for summary judgement</u>" or "a stipulation of dismissal signed by all parties who have appeared." Rule 41(a)(1)(A) (emphasis added).

In the present case, Defendants have filed a Motion for Summary Judgment. [Docket No. 55]. Therefore, Plaintiff may not dismiss any portion of his claims without "a stipulation of dismissal signed by all parties who have appeared." Rule 41(a)(1)(A). On the record now before the Court, there is no stipulation of dismissal signed by the parties. Nor does Defendants mere acquiescence to the purported voluntary dismissal satisfy the requirements of Rule 41 because the Rule specifically requires the stipulation of dismissal to be signed. Thus, Plaintiff may not dismiss any portion of his remaining claims absent a Court Order.

Nevertheless, because Plaintiff seeks to dismiss certain Defendants and because Defendants have acquiesced to that request, the undersigned will recommend that Defendants Savat, Rood, Magnuson, Nelson, Blum, Livingood, Johnson, Hermes, Stetz, Then, White-Tutton, Torkelson, Larson, Roberts, and Clay County, as well as, all claims alleged against them be

**DISMISSED**. Therefore, to the extent Defendants' Motion for Summary Judgment, [Docket No. 55], seeks an Order of this Court dismissing Plaintiff's claims as alleged against Defendants Savat, Rood, Magnuson, Nelson, Blum, Livingood, Johnson, Hermes, Stetz, Then, White-Tutton, Torkelson, Larson, Roberts, and Clay County, the undersigned recommends that Defendants' Motion for Summary Judgment, [Docket No. 55], be **GRANTED**.

The removal of these Defendants leaves for this Court's consideration Plaintiff's Denial of Due Process Right to Adequate Medical Care and Denial of Due Process Right to Life claims as alleged against Defendants Benson, Bartness, Hanson, Olson, Lien, and Heck.

### B. Plaintiff's Claims

Although Plaintiff separately asserts two claims in his Amended Complaint, Plaintiff, and more importantly the law relevant to the present motion, treat these claims as a single claim. Plaintiff asserts a claim alleging a Denial of Due Process Right to Adequate Medical Care and a claim which asserts a Denial of Due Process Right to Life. Each of these claims arises under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Both of these remaining claims is based on Plaintiff's allegation that Defendants were deliberately indifferent to Ms. Rudolph's serious medical need. Because each of Plaintiff's remaining claims is based on his assertion that the remaining Defendants were deliberately indifferent to Ms. Rudolph's serious medical need, the Court simultaneously discusses Plaintiff's two remaining claims.

Claims based on deliberate indifference to a serious medical need raise concerns under the Eighth Amendment's prohibition on cruel and unusual punishment. McCaster v. Clausen, 684 F.3d 740, 746 (8th Cir. 2012). If a detainee is a pretrial detainee, however, her deliberate indifference claim is properly analyzed as a Fourteenth Amendment due process claim. Bell v.

Wolfish, 441 U.S. 520, 535 n. 16 (1979). The Eighth Circuit has repeatedly held that pretrial detainees are entitled to "at least as great protection as that afforded convicted prisoners under the Eighth Amendment." Owens v. Scott County Tail, 328 F .3d 1026, 1027 (8th Cir. 2003) (internal quotation marks omitted).

Prison administrators and agents, such as correctional officers, violate the Eighth Amendment and thereby the Due Process Clause of the Fourteenth Amendment, if their "acts or omissions [are] sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976). A claim for deliberate indifference requires a plaintiff to demonstrate both an objective and subjective component. Thompson v. King, 730 F.3d 742, 746 (8th Cir. 2013); Jackson v. Buckman, 756 F.3d 1060, 1065 (8th Cir. 2014).

First, the plaintiff must show that there was an objectively serious medical need. Thompson, 730 F.3d at 746 (quoting McRaven v. Sanders, 577 F.3d 974, 980 (8th Cir. 2009)). The objective component of a claim for deliberate indifference to serious medical needs is satisfied if the medical need in question "is supported by medical evidence, such as a physician's diagnosis, or is 'so obvious that even a layperson would easily recognize the necessity for a doctor's attention.'" Bailey v. Feltmann, 810 F.3d 589, 593 (8th Cir. 2016) (quoting McRaven v. Sanders, 577 F.3d 974, 980 (8th Cir. 2009)).

Second, regarding the subjective component of claims asserting a deliberate indifference to a serious medical need, the plaintiff must demonstrate "that the defendant actually knew of, but deliberately disregarded, such need." Thompson, 730 F.3d at 746. To show that a defendant knew of but deliberately disregarded an objectively serious medical need, "the plaintiff must establish a mental state akin to criminal recklessness: disregarding a known risk to the inmate's health." Thompson, 730 F.3d at 746–47 (citation omitted). This is a high standard, and "requires

a showing more than negligence, more even than gross negligence, but less than purposefully causing or knowingly bringing about a substantial risk of serious harm to the inmate." Id. at 747 (internal quotation marks and citations omitted). The requisite mental state may be established through circumstantial evidence, as "a factfinder may determine that a defendant was actually aware of a serious medical need but deliberately disregarded it, from the very fact that the [medical need] was obvious." Id. (quoting Vaughn v. Gray, 557 F.3d 904, 908–09 (8th Cir. 2009).

### C.  Standard of Review

Summary judgment is appropriate when the evidence demonstrates that there is no genuine issue of material fact such that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Smutka v. City of Hutchinson, 451 F.3d 522, 526 (8th Cir. 2006). As the Eight Circuit Court of Appeals has explained:

> Summary judgment should be granted if the evidence, viewed in the light most favorable to the nonmoving party, indicates that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. A party opposing summary judgment may not rest upon mere allegations or denials contained in the pleadings, but must, by sworn affidavits and other evidence, set forth specific facts showing that there is a genuine issue for trial.

Mehrkens v. Blank, 556 F.3d 865, 868–69 (8th Cir. 2009) (citations omitted). The evidence must be viewed in the light most favorable to the nonmoving party, and the nonmoving party must be given the benefit of all reasonable inferences to be drawn from the underlying facts in the record. Mirax Chem. Prods. Corp. v. First Interstate Commercial Corp., 950 F.2d 566, 569 (8th Cir. 1991); Scott v. Harris, 550 U.S. 372, 380 (2007).

Further,

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions

23

> on file, together with the affidavits, if any,' which it believes demonstrate the
> absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party does so, the nonmoving party must "designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324. A disputed fact is "material" if it might affect the outcome of the case, and a factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

"Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." Thomas v. Corwin, 483 F.3d 516, 526–27 (8th Cir. 2007). While the burden of demonstrating the absence of any genuine issue of material fact rests on the moving party, the nonmoving party may not rest on mere allegations or denials in their pleadings, but the non-moving party must set forth specific admissible evidence-based facts showing the existence of a genuine issue. Forrest v. Kraft Foods, Inc., 285 F.3d 688, 691 (8th Cir. 2002). "A properly supported motion for summary judgment is not defeated by self-serving affidavits." Frevert v. Ford Motor Co., 614 F.3d 466, 473 (8th Cir. 2010) (quoting Bacon v. Hennepin Cty. Med. Ctr., 550 F.3d 711, 716 (8th Cir. 2008)). "Rather, the plaintiff must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor." Id. at 473–74.

### D. Material Facts

The record now before the Court, when viewed in the light most favorable to Plaintiff as the non-moving party, provides as follows.

On October 30, 2016, Ms. Rudolph was arrested on suspicion of shop lifting at a Menards in Moorhead, Minnesota. (Police Report [Docket No. 58-1]). Upon her arrest, she was transported to the Clay County jail. (Id.). She was booked into the Clay County jail at 5:29 p.m.

on October 30, 2016, during which she was asked a number of intake questions related to her physical and mental health. (Booking Card [Docket No. 58-2]). During the completion of the questionnaire, Ms. Rudolph declined the use of "street drugs," and she declined having any problems when she "stopped doing/using drugs." (Id.). Initially, Ms. Rudolph was placed in the "female block" with other female detainees. (See, Blum Report [Docket No. 58-9]).

The morning of the following day, October 31, 2016, at 10:00 a.m., Defendant Nurse Michelle Pender (hereinafter "Defendant Nurse Pender") completed a Health Assessment form with Ms. Rudolph. (Health Assessment [Docket No. 58-6]).[3] Ms. Rudolph reported having used heroin four month prior to her interaction with Defendant Nurse Pender. (Id.). A drug test was not performed at the time of the Health Assessment. (Id.).

At approximately 7:30 p.m. on October 31, 2016, Defendant Correctional Officer Raynor Blum (hereinafter "Defendant Blum") was completing his "rounds" in the "female block" when a then unspecified female prisoner informed him that she and other detainees had concerns for Ms. Rudolph, and that Ms. Rudolph was experiencing "withdraws." (Blum Report [Docket No. 58-9]). Defendant Blum found the female inmate "hard to understand," and he asked her to write down her concerns for him to pick up on his next rounds. (Id.). On his next rounds he received the note which indicated that Ms. Rudolph had informed the other detainees that she was withdrawing from heroin, that Ms. Rudolph had been observed yelling and thrashing in her sleep throughout the night, that she had not eaten or drank anything nor gone to the bathroom "all day," that Ms. Rudolph had reported being too weak to stand, and that Ms. Rudolph reported that she had heroin in her locker. (Note, [Docket No. 76-1], at 3). Upon receiving the note, Defendant

---

[3] Defendant Nurse Pender was then employed by Defendant MEnD Correctional Care. (See, Id.). As noted above, Defendant Nurse Pender has been dismissed from the present action.

Blum gave the note to Defendant Team Leader Nancy Livingood (hereinafter "Defendant Livingood"). (Blum Report [Docket No. 58-9]).[4]

Upon receiving the note, Defendant Livingood removed Ms. Rudolph from the "female block" to speak with her about the concerns expressed by the other detainees. (Incident Report, [Docket No. 76-1], at 2). Ms. Rudolph reported to Defendant Livingood that "she had used a little but that she was fine . . . ." (Id.). Ms. Rudolph was then returned to the "female block." (Id.). Defendant Livingood also searched Ms. Rudolph's locker in which Defendant Livingood found a clear package which itself contained two other clear packages. (Id.). Defendant Livingood provided the packages to a Deputy Sheriff. (Id.). At approximately 9:57 p.m., that Deputy Sheriff informed Defendant Livingood that one of the packages contained "meth," and he believed the substance in the other package to be heroin, however, it needed to be sent off for confirmation. (Id.).[5]

During this time, Defendant Livingood instructed Defendant Correctional Officer Anthony Hanson (hereinafter "Defendant Hanson") to move Ms. Rudolph from the "female block" to an individual holding cell. (Livingood Aff., [Docket No. 60], at 2). At approximately 10:30 p.m., on October 31, 2016, Defendant went to the holding cell to inform Ms. Rudolph of the items found in her locker. (Id.).

The Medical Pass On sheet dated October 31, 2016, does not contain any information related to Ms. Rudolph. (See, Pass On Sheet [Docket No. 58-39]).[6] Likewise, the Medical Pass

---

[4] This interaction is reported on the electronic Jail Activity Log for October 31, 2016. (Jail Activity Log, [Docket No. 63-1], at 38).
[5] The discovery of this contraband is noted on the electronic Jail Activity Log for October 31, 2016. (Jail Activity Log, [Docket No. 63-1], at 38).
[6] A Medical Pass On sheet is a printed form which provides correctional officers with the phone numbers for the nurses who are on call; a list of any detainee who is to be administered medication or who has any medical conditions that need to be addressed; and any notes the medical staff seek to pass on to the correctional officers. (See, Nelson Depo., [Docket No. 58-44], at 15:18–16:15). It is prepared by the medical staff each day. (Nelson Depo., [Docket No. 58-44], at 15:18–16:15). The printed form is placed in the control room. (Id.). If correctional

On Sheet does not have any handwritten notes from the correctional officers regarding the day's events in relation to Ms. Rudolph. (See, Id.).

At approximately 8:00 a.m. on November 1, 2016, medical staff learned that the contraband containing suspected narcotics had been found in Ms. Rudolph's locker. (Video, [Docket No. 58-11], at 8:00–8:06). Medical staff learned of the items found in Ms. Rudolph's locker from a report left in the window of the door to Ms. Rudolph's cell. (Id.).

On November 1, 2016, Defendant Nurse Pender requested to see Ms. Rudolph. (Zimmel Decl. [Docket No. 61]). At approximately 1:00 p.m. on November 1, 2016, non-party Correctional Officer Eric Zimmel escorted Ms. Rudolph to Defendant Nurse Pender, and Officer Zimmel stayed for the approximately fifteen minutes Ms. Rudolph was with Defendant Nurse Pender. (Id.).

At some time between 1:00 p.m. and 2:00 p.m. on November 1, 2016, Defendant Correctional Officer Tiffany Larson (hereinafter "Defendant Larson") went to the holding cell to inform Ms. Rudolph that medical staff had ordered a urinalysis test to be conducted. (Larson Report [Docket No. 58-14]). When Defendant Larson arrived at the holding cell, she observed that Ms. Rudolph's mattress was on the floor near the toilet and that on the floor next to the mattress was a "green chunky substance" which appeared to be vomit. (Id.).[7] Upon inquiry from Defendant Larson, Ms. Rudolph reported that she had vomited multiple times, including a few times that she missed the toilet, and that she was "withdrawing" and "coming down from drugs." (Id.). Ms. Rudolph reported to Defendant Larson that she had used heroin three days prior. (Id.). Ms. Rudolph said she would be able to provide a urine sample, but that she needed new

_____

officer had medically relevant observations of detainees to be passed on to medical staff, the correctional officers could write the information onto the form which would then be provided to medical staff. (Nelson Depo, [Docket No. 58-15], at 14:23–15:16).

[7] Defendant Blum also observed this vomit on the floor during the night, and he reported its presence to Defendant Livingood. (Blum Report [Docket No. 58-9]).

underwear. (Id.). Thereafter, Ms. Rudolph provided Defendant Larson with the urine sample, and Ms. Rudolph was provided with new underwear. (Id.). Defendant Larson reported the condition of Ms. Rudolph's cell to Defendant Benson. (Id.).[8]

During her later deposition, Defendant Nurse Pender testified that she was never made aware of the vomit observed in Ms. Rudolph's cell or that Ms. Rudolph had reported vomiting several times. (Pender Depo., [Docket No. 58-7], at 69:18–72:21).

Defendant Larson provided the urine sample to medical staff. (Larson Report [Docket No. 58-14]). Ms. Rudolph's urine sample tested positive for THC, methamphetamines, opioids, and amphetamines. (Ex. 16 [Docket No. 58-16]).

Throughout the day, on November 1, 2016, correctional officers provided Ms. Rudolph with food for breakfast, lunch, and dinner. (Internal Report, [Docket No. 76-1], at 18–19). Ms. Rudolph failed to eat any of the food provided to her. (Id.).

Defendant Correctional Officer Ashley Johnson (hereinafter "Defendant Johnson") reported that when she provided Ms. Rudolph with her breakfast on November 1, 2016, Ms. Rudolph informed her that she could not eat. (Internal Report, [Docket No. 76-1], at 57). Defendant Johnson asked Ms. Rudolph to try to eat or at least drink the "juice/milk" provided; however, Ms. Rudolph did not eat any of the food provided or drink any of the liquids left for her. (Internal Report, [Docket No. 76-1], at 18–19). At her later deposition, Defendant Nurse Pender testified that she was never informed that Ms. Rudolph had not eaten on November 1, 2016. (Pender Depo., [Docket No. 58-7], at 69:18–72:21).

During the evening shift, Defendant Correctional Officer Jana Bartness was the team leader for the correctional officers. (Bartness Depo., [Docket No. 58-19], at 5:11–6:23). At

---

[8] The Jail Activity Log for November 1, 2016, contains an entry from Defendant Benson which reads Ms. Rudolph "out to shower/given all clean linen/provided UA for nurse." (Jail Activity Log, [Docket No. 63-1], at 29).

approximately 8:00 p.m., on November 1, 2016, non-party Correctional Officer Cody Benson reported to Defendant Bartness that Ms. Rudolph was talking but "not making much sense" and fidgeting. (Id. at 12:20–13:7). Upon receiving this information Defendant Bartness and Defendant Correctional Officer Lucas Heck went to Ms. Rudolph's cell, and they informed her she was being moved to a "high risk" cell so she could be monitored more closely. (Id. at 13:8–15:24). Ms. Rudolph informed Defendant Bartness and Defendant Heck that she was "detoxing from heroin." (Id.; Bartness Report [Docket No. 58-18]). Due to her report that she was "detoxing from heroin," Ms. Rudolph was placed on medical watch to be observed at least every fifteen minutes. (Bartness Depo., [Docket No. 58-19], at 13:8–15:24; Bartness Report [Docket No. 58-18]).[9]

As a result of having been placed on medical watch, jail staff was required to observe Ms. Rudolph at least once every fifteen minutes, and they were further required to complete a "seclusion sheet" which has a column for the staff initials, the time observed, and the "Condition of Inmate/ Behavior Observed." (Bartness Depo., [Docket No. 58–19], at 15:8–24; Seclusion Sheet [Docket No. 58-40). Between 7:50 p.m. on November 1, 2016, when Ms. Rudolph was moved to the high-risk cell and 8:46 a.m. on November 2, 2020, there are fifty-two entries on Ms. Rudolph's seclusion sheet. (Seclusion Sheet [Docket No. 58-40]). The "Condition of Inmate/Behavior Observed" column for fifty of those entries merely reads "OK." (Seclusion Sheet [Docket No. 58-40]). Of the remaining two entries, the "Conditions of Inmate/Behavior Observed" for one entry is blank, and the other entry reads "breakfast served." (Id.).

At approximately 9:30 p.m. on November 1, 2016, while Ms. Rudolph was on medical watch in the high-risk cell, Defendant Hanson approached Ms. Rudolph's cell after he heard her

---

[9] A summary of Defendant Benson's interaction with Ms. Rudolph and the information reported to Defendant Benson in on the Jail Summary Log for November 1, 2016. (Jail Summary Log, [Docket No. 63-1], at 26).

trying to obtain his attention. (Hanon Report, [Docket No. 76-1], at 35). Defendant Hanson observed that Ms. Rudolph had vomited, and she was laying on the floor near the toilet. (Id.). Ms. Rudolph had a towel covering her head, and she asked that the lights be turned off. (Id.).

The record does not contain a Medical Pass On sheet for November 1, 2016.

At some time before 10:00 a.m. on November 2, 2016, Defendant Justin Roberts (hereinafter "Defendant Roberts"), the Assistant Jail Administrator, observed Ms. Rudolph sleeping on her mattress on the floor near the toilet. (Roberts Report [Docket No. 58-27]). Defendant Roberts also observed a soiled pair of underwear on the floor next to Ms. Rudolph, "what appeared to be feces in the toilet," and urine on the floor. (Id.). Defendant Roberts also discovered that Ms. Rudolph has soiled herself in the bed. (Id.). Upon discovery of Ms. Rudolph's then current state, Ms. Rudolph was taken to the shower, she was provided with new clothes, and her cell was cleaned. (Id.).[10]

At 10:00 a.m. on November 2, 2016, Ms. Rudolph met with Defendant Nurse Pender. (Medical Staff Narrative Note, [Docket No. 76-1], at 40). Defendant Nurse Pender's notes indicate that Ms. Rudolph reported being "sick to [her] stomach." (Id.). The notes further indicate that Ms. Rudolph was encouraged to "sip on fluids" and use the toilet after she had been "incontinent on the floor." (Id.). During this visit, Defendant Nurse Pender completed a "Flow Sheet-Chemical Withdraw" form. (Id. at 42). Ms. Rudolph received a score of six on the form after receiving six points for "eating disturbances." (Id.). Ms. Rudolph did not receive any points in the categories of tremors, sleep issues, orientation, hallucinations, communications, agitation, or sweating. (Id.). On the form, Defendant Nurse Pender noted that Ms. Rudolph had been

---

[10] A summary of this occurrence is on the electronic Jail Activity log for November 2, 2016. (Jail Activity Log, [Docket No. 63-1], at 19).

instructed to drink fluids and placed on a clear liquid diet. (Id.). Defendant Nurse Pender placed Ms. Rudolph on a "clear liquid diet until no vomiting." (Diet Order [Docket No. 58-31]).

The evening of November 2, 2016, Defendant Correctional Officer Amber Nelson (hereinafter "Defendant Nelson") approached Ms. Rudolph's cell to retrieve her dinner tray, and Ms. Rudolph requested a "new blue bag for puking" because the "puke bag" she had was full. (Nelson Report [Docket No. 58-43]). Defendant Nelson provided Ms. Rudolph with a new bag, and she disposed of the full bag. (Id.).

Later into the night of November 2, 2016, Ms. Rudolph asked Defendant Bartness for another "puke bag," and Defendant Bartness provided it to her. (Bartness Report [Docket No. 58-18]). Defendant Heck disposed of the old, full "puke bag." (Id.).

The Seclusion Sheet dated November 2, 2016, covers the period of time from 9:00 a.m. on November 2, 2016, though 9:30 a.m. on November 3, 2016. (Seclusion Sheet, [Docket No. 58-40], at 3–4). Of the 104 entries covering this time period all but eight read "OK." (Id.). Of the eight outliers, three are blank; one reads "sleepy"; one reads "gave water, new vomit bag"; one reads "gave 2-juice, milk, [and] [G]atorade"; one reads "OK-shower;" and the final one reads "OK-nurse call." (Id.).

As it relates to Ms. Rudolph, the Medical Pass On sheet for November 2, 2016, does not have any printed message from medical staff related to Ms. Rudolph. (Medical Pass On Sheet, [Docket No. 58-39], at 4). There is a handwritten noted from unspecified correctional officers that read, "Gatorade in med fridge" and "encourage sips ever ½ hour on rounds." (Id.).

At approximately 12:30 a.m. on November 3, 2016, Defendant Correctional Officer Cassie Olson (hereinafter "Defendant Olson") provided Ms. Rudolph with a partially full bottle of Gatorade, a glass of water, and a new blue vomit bag because Ms. Rudolph's old vomit bag

was full. (Olson Report [Docket No. 76-1], at 52). Defendant Olson had Ms. Rudolph dump the contents of the old vomit bag into the toilet, and Defendant Olson disposed of the old vomit bag. (Id.).[11]

At 4:34 a.m. on November 3, 2016, Defendant Olson and Defendant Correctional Officer Devin Lien (hereinafter "Defendant Lien") provided Ms. Rudolph with another glass of water, and they had Ms. Rudolph again pour her vomit bag into the toilet. (Olson Report, [Docket No. 76-1], at 52; Lien Report, [Docket No. 76-1], at 53). Ms. Rudolph was provided with a new bag.[12]

During the time between 4:34 a.m. and 6:45 a.m., Defendant Lien had three more interactions with Ms. Rudolph. (Lien Report, [Docket No. 76-1], at 53]). Defendant Lien first heard "sounds of distress coming from the high-risk cell," and upon responding to the sound Ms. Rudolph requested a new vomit bag and for her old, used bag to be disposed of. (Id.). Thereafter, Defendant Lien observed non-party Correctional Officer Darren providing Ms. Rudolph with another vomit bag and assisting Ms. Rudolph with disposing of the old, used vomit bag. (Id.).

On November 3, 2016, at approximately 12:06 p.m., Defendant Correctional Officer Brianna Then (hereinafter "Defendant Then") observed Ms. Rudolph laying on her bunk with her eyes open and a "catatonic look on her face." (Then Report, [Docket No. 76-1], at 54). Although Ms. Rudolph verbally responded, Defendant Then reported that Ms. Rudolph "seemed out of it." (Id.).

At approximately 1:30 p.m. on November 3, 2016, Defendant Correctional Officer Amy Rood (hereinafter "Defendant Rood") provided Ms. Rudolph with a new vomit bag upon Ms.

---

[11] The electronic Jail Activity Log for November 3, 2016, contains a summary of this interaction. (Jail Activity Log, [Docket No. 63-1], at 10).
[12] The electronic Jail Activity Log for November 3, 2016, contains a summary of this interaction. (Jail Activity Log, [Docket No. 63-1], at 8).

Rudolph's request for a new vomit bag. (Rood Report, [Docket No. 76-1], at 56). Defendant Rood had Ms. Rudolph empty her old, used vomit bag into the toilet, and the old, used vomit bag was disposed of. (Id.). Approximately fifteen minutes later at 1:45 p.m., Defendant Roberts observed "a colored liquid of some type" on the floor of Abby's cell. (Roberts Report [Docket No. 58-27]).

The Seclusion Sheet dated November 3, 2016, has entries at ever fifteen-minute interval from 9:45 a.m. until 2:00 p.m. on November 3, 2016. (Seclusion Sheet [Docket No. 58-40]). Each of the entries simply reads, "OK." (Id.).

At 2:00 p.m. Defendant Nurse Pender went to see Ms. Rudolph in her cell, and Defendant Nurse Pender completed a Chemical Withdraw Flow Sheet. (Flow Sheet-Chemical Withdraw, [Docket No. 76-1], at 42). This time Ms. Rudolph received a score of twelve having received six points for "eating disturbance" and six points for "orientation." (Id.). Defendant Nurse Pender informed Ms. Rudolph that Defendant Nurse Pender wanted Ms. Rudolph to take a shower. (Hermes Report [Docket No. 58-20]).

Defendant Correctional Officer Anastacia Hermes began escorting Ms. Rudolph to the shower; Defendant Nurse Pender did not initially accompany them. (Id.). As Ms. Rudolph approached the shower, she began to sit down on the floor. (Id.). Defendant Hermes asked Ms. Rudolph to move to the bench inside the shower to sit, and Ms. Rudolph was able to move to the bench inside the shower with Defendant Hermes assisting her by hold her arm for balance. (Id.). Defendant Hermes then informed Defendant Roberts of her belief that Ms. Rudolph should not be left alone in the shower, and Defendant Hermes returned to the shower area. (Id.). As Defendant Hermes returned to the shower area, Ms. Rudolph moved to the floor at which time

Defendant Hermes continued to speak with Ms. Rudolph, although Defendant Hermes observed that Ms. Rudolph was "quite [sic] pale." (Id.).

At 2:07 p.m. on November 3, 2016, while in the shower, Ms. Rudolph's body began to "jerk" in a manner "similar to seizure activity." (Id.). Defendant Hermes entered the shower to attempt to get a response from Ms. Rudolph. (Id.). Defendant Hermes observed that Ms. Rudolph had a "distant stare," and her body continued to "jerk." (Id.). Defendant Hermes radioed for Defendant Nurse Pender to respond, moved Ms. Rudolph to the laying position, and then radioed that she believed Ms. Rudolph was having a seizure. (Id.).

After an unspecified number of minutes, Ms. Rudolph's body stopped "jerking," and Ms. Rudolph became responsive. (Id.). Ms. Rudolph was moved onto the bench in the shower. (Id.). While Ms. Rudolph was on the bench, her responses became "grunts," she again became "very pale," she had a "withdrawn look in her eyes, her hands became very cold, and she started to loss control of her bodily functions." (Id.).

At 2:15 p.m. on November 3, 2016, persons from the Moorhead Fire Department arrived to assist. (Id.). At 2:17 p.m. ambulance first responders arrived at the scene. (Id.). Ms. Rudolph was then placed on a gurney, and she was moved to the ambulance in the jail parking lot. (Id.). Upon placing Ms. Rudolph in the ambulance, the first responders administered medical care, including manual CPR and machine assisted CPR. (Id.).

The first responders were not able to revive Ms. Rudolph. (Sheriff's Office Report [Docket No. 76-1], at 6). Although the ambulance remained in the jail parking lot, at 2:52 p.m., a doctor from Essentia Health gave the order to discontinue resuscitation efforts. (Id.).

### E. Analysis

As noted above, Defendants[13] argue that they are each entitled to qualified immunity. Defendants assert that Plaintiff's claims as raised against them should therefore be dismissed.

The doctrine of qualified immunity protects state actors from civil liability when their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The defense provides "ample room for mistaken judgments" as it protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341, 343 (1986).

To overcome the defense of qualified immunity, a plaintiff must show that: (1) the facts demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation. Parrish v. Ball, 594 F.3d 993, 1001 (8th Cir. 2010) (citation omitted).

### 1. Deprivation of Constitutional Right

In the present case, Plaintiff alleges that Ms. Rudolph was deprived of her constitutional right to be provided adequate medical care while being detained by the state. Plaintiff alleges that Defendants were deliberately indifferent to Ms. Rudolph's serious medical need.

A claim for deliberate indifference has both an objective and subjective component. Thompson v. King, 730 F.3d 742, 746 (8th Cir. 2013); Jackson v. Buckman, 756 F.3d 1060, 1065 (8th Cir. 2014). Plaintiff must demonstrate that Ms. Rudolph has an objectively serious medical need, and Plaintiff must also demonstrate that Defendants knew of but deliberately disregarded that objectively serious medical. See, Thompson, 730 F.3d at 746.

---

[13] As discussed in the present section, "Defendants" refers to the remaining Defendants in the present action.

### 1. Objective Serious Medical Need

To satisfy this prong, the plaintiff must show that there was an objectively serious medical need. Thompson, 730 F.3d at 746 (quoting McRaven v. Sanders, 577 F.3d 974, 980 (8th Cir. 2009)). An objectively serious medical need is one that is either supported by a physician's diagnosis or is "so obvious that even a layperson would easily recognize the necessity for a doctor's attention." Bailey v. Feltman, 810 F.3d 589, 594 (8th Cir. 2016). As one Court in this District has explained, if "a plumber or bus driver or dishwasher" were to see the injured party and hear her complaints and that "layperson would undoubtedly have told [her]: 'You really need to see a doctor,'" then plaintiff has demonstrated an objective serious medical need. Trujillo v. Corizon Health, Inc., No. 17-cv-1633 (PJS/ECW), 2019 WL 1409331, at *3 (D. Minn. Mar. 28, 2019).

Viewing the record now before the Court in the light most favorable to Plaintiff and drawing all reasonable inferences thereon in Plaintiff's favor, Plaintiff has demonstrated an objectively serious medical need. Specifically, Plaintiff has demonstrated that Ms. Rudolph had an objectively serious medical need so obvious that even a layperson would easily recognize the serious objective medical need.

In the present case, Defendants Benson, Bartness, Hanson, Olson, Lien, and Heck each observed circumstances which would lead a layperson to recognize that Ms. Rudolph had an objectively serious medical need. Specifically, Defendant Benson knew that Ms. Rudolph had soiled herself and was continually vomiting because she was "withdrawing" from using "heroin", (Larson Report [Docket No. 58-14]); Defendant Bartness and Defendant Heck knew that Ms. Rudolph was "detoxing from heroin," (Bartness Report [Docket No. 58-18]); Defendant Bartness knew that Ms. Rudolph was speaking incoherently and fidgeting, (Bartness Depo.,

36

[Docket No. 58-19], at 12:20–13:7); and Defendant Hanson observed Ms. Rudolph laying on the floor near the toilet because she was repeatedly vomiting. (Hanson Report, [Docket No. 76-1], at 35). In addition, Defendants Bartness, Heck, Olson, and Lien each, on at least one occasion, provided Ms. Rudolph with a new vomit bag after observing that Ms. Rudolph's old, used vomit bag had been filled enough with vomit that it needed to be emptied. (Bartness Report [Docket No. 58-18]; Olson Report, [Docket No. 76-1], at 52; Lien Report, [Docket No. 76-1], at 53). In total, Defendants Benson, Bartness, Hanson, Olson, Lien, and Heck observed Ms. Rudolph repeatedly vomiting on at least seven occasions. (Bartness Report [Docket No. 58-18]; Olson Report, [Docket No. 76-1], at 52; Lien Report, [Docket No. 76-1], at 53; Larson Report [Docket No. 58-14]).[14]

On this record, a fact finder could reasonably infer that Ms. Rudolph's serious medical need was so obvious that a layperson would easily recognize the necessity for a doctor's attention. "Had, say, a plumber or bus driver or dishwasher seen" Ms. Rudolph's condition and repeated vomiting, "that layperson would undoubtedly have told [her]: 'You really need to see a doctor." See, Trujillo v. Corizon Health, Inc., No. 17-cv-1633 (PJS/ECW), 2019 WL 1409331, at *3 (D. Minn. Mar. 28, 2019). Thus, the Court finds that Plaintiff has sufficiently demonstrated an objectively serious medical need requisite to survive summary judgment.

Relying on Roberts v. Kopel, 917 F.3d 1039 (8th Cir. 2019), Defendants assert that a medical need can never be sufficiently obvious to a layperson when said medical need was not obvious to a medical professional. Applying this proposition to the present case, Defendants argue that Ms. Rudolph's medical need could not be sufficiently obvious to them because it was

____

[14] These seven instances do not include the several other times Ms. Rudolph was observed vomited by the other corrections officers, (See, Internal Report [Docket No. 76-1]; Roberts Report [Docket No. 58-27]; Nelson Report [Docket No. 58-43]), nor the several instances Ms. Rudolph vomited which were not reported by any correctional officer which can be observed on the videos of Ms. Rudolph's cell. (See, Camera 20 Video [Docket No. 58-11]; Camera 7 Video [Docket No. 58-21]; Camera 7 Video [Docket No. 58-45]; Camera 20 [Docket No. 58-49]).

not obvious to Defendant Nurse Pender. Defendants argument assumes, without the benefit of support to the factual record or caselaw, that Defendant Nurse Pender's failure to provide increased medical care to Ms. Rudolph's demonstrates that Ms. Rudolph's serious medical need was not obvious to Defendant Nurse Pender. Defendants' reliance on <u>Roberts</u> is misplaced, and the Court finds Defendants' arguments here to be unpersuasive.

Despite Defendants' attempted construction thereof, <u>Roberts</u> is not so broad as they attempt to construe it. Instead, <u>Roberts</u> stands for the proposition that a medical need may not be sufficiently obvious to a layperson when it was not obvious to a medical professional <u>who had been apprised of all the relevant information</u>. <u>See</u>, <u>Roberts</u>, 917 F.3d at 1043. Unlike the circumstances of the present case, the <u>Roberts</u> Court specifically noted that the plaintiff there had been reviewed by two medical professionals, and plaintiff had "described to these medical professionals the same symptoms . . . he had previously described to numerous corrections officers." <u>Id.</u> at 1042–43. This is in stark contrast to the present case.

In the present case, Plaintiff specifically argues, and the record demonstrates, that the medical professional upon which Defendants now seek to rely was not provided with all the relevant information nor the majority of Defendants' observations of Ms. Rudolph. "A prison official may rely on a medical professional's opinion" only "if such reliance is reasonable." <u>McRaven v. Sanders</u>, 577 F.3d 974, 981 (8th Cir. 2009) (citing <u>Meloy v. Bachmeier</u>, 302 F.3d 845, 849 (8th Cir. 2002)). When the defendant is aware of medical information of which the medical professional was not privy, it is unreasonable for that defendant to rely upon a medical opinion without informing the medical professional of the relevant facts. <u>McRaven v. Sanders</u>, 577 F.3d 974, 981–82 (8th Cir. 2009).

In the present case, Defendants Benson, Bartness, Hanson, Olson, Lien, and Heck were each aware of medically relevant information which was not conveyed to Defendant Nurse Pender, the medical professional upon whose opinion Defendants now seek to rely. As discussed above, Defendants Benson, Bartness, Hanson, Olson, Lien, and Heck observed Ms. Rudolph repeatedly vomiting on at least seven occasions. (Bartness Report [Docket No. 58-18]; Olson Report, [Docket No. 76-1], at 52; Lien Report, [Docket No. 76-1], at 53; Larson Report [Docket No. 58-14]).[15] Further, Defendants Bartness, Heck, Olson, and Lien each, on at least one occasion, provided Ms. Rudolph with a new vomit bag after observing that Ms. Rudolph's old, used vomit bag had been filled enough with vomit that it needed to be emptied. (Bartness Report [Docket No. 58-18]; Olson Report, [Docket No. 76-1], at 52; Lien Report, [Docket No. 76-1], at 53). It was also reported to Defendant Bartness that Ms. Rudolph was speaking incoherently and fidgeting. (Bartness Depo., [Docket No. 58-19], at 12:20–13:7).

Defendant Nurse Pender specifically testified at her deposition that she was never informed that Ms. Rudolph had vomited several times, nor that vomit had been observed in her cell. (Pender Depo., [Docket No. 58-7], at 69:18–72:21). Defendant Nurse Pender repeatedly testified that she was not made aware of these observations and symptoms, including the observations of incoherency and fidgeting. (See, e.g., Id. at 69:18–72:21; 74:13–77:4; 82:25–83:21).

Defendant Nurse Pender testified that if the relevant information were to be passed to her it would be through the seclusion sheet which she was able to review or orally from the team leader. (Pender Depo., [Docket No. 58-7], at 60:16–64:21; 67:5–68:3). However, Defendant

---

[15] Again, these seven instances do not include the several other times Ms. Rudolph was observed vomited by the other corrections officers, (See, Internal Report [Docket No. 76-1]; Roberts Report [Docket No. 58-27]; Nelson Report [Docket No. 58-43]), nor the several instances Ms. Rudolph vomited which were not reported by any correctional officer which can be observed on the videos of Ms. Rudolph's cell. (See, Camera 20 Video [Docket No. 58-11]; Camera 7 Video [Docket No. 58-21]; Camera 7 Video [Docket No. 58-45]; Camera 20 [Docket No. 58-49]).

Nurse Pender reiterated that she was not informed of any symptoms by any correctional officer; that she was unaware that Ms. Rudolph had not eaten her food; unaware that Ms. Rudolph had been vomiting on November 1, 2016; and unaware of any of the information contain within the Correctional Officers' reports. (Id. at 69:18–21; 71:12–77:15). She testified that she was only aware of the information contained on the Seclusion Sheet. (Id. at 82:10–83:25). She further testified that if she had been aware of the additional information, she would have redone the Flow Sheet-Chemical Withdraw form. (Id.).

Defendants argue that medical staff, including Defendant Nurse Pender, "had all pertinent information about [Ms.] Rudolph at their disposal," including information from pass on forms detailing information from day to day and the Jail Activity Log. (Defs.' Mem., [Docket No. 57], at 11). In so arguing, however, Defendants improperly present the evidence in the light most favorable to Defendants, and further, they improperly make several inferences in their favor. See, e.g., Mirax Chem. Prods. Corp. v. First Interstate Commercial Corp., 950 F.2d 566, 569 (8th Cir. 1991) (providing that the evidence must be viewed in the light most favorable to the nonmoving party, and the nonmoving party must be given the benefit of all reasonable inferences to be drawn from the underlying facts in the record); Scott v. Harris, 550 U.S. 372, 380 (2007) (same).

As noted above, Defendant Nurse Pender repeatedly testified that she was not made aware of these observations of repeated vomiting or any symptoms. (See, e.g., Pender Depo., [Docket No. 58-7], at 69:18–72:21; 74:13–77:4; 82:25–83:21). She further specifically testified that she had never seen a Jail Activity Log before her deposition; that she had never accessed a

40

Jail Activity Log; that she did not, in fact, have permitted access to any Jail Activity Log; and that she never received the information from it. (Id. at 73:9–21).[16]

On the record now before the Court, the only reasonable inference, in light of the requisite standard by which this Court must abide, is that Defendant Nurse Pender was not provided with the medically relevant observations made by Defendants Benson, Bartness, Hanson, Olson, Lien, and Heck. Any inference or assumption to the contrary would be improper in light of the requisite standard by which this Court must abide at this summary judgment stage.[17]

---

[16] In support of the present Motion and their assertion that Defendant Nurse Pender had access to the information on the Jail Activity Log, Defendants submitted documentation purporting to indicate that Defendant Nurse Pender does in fact have an account and "LoginID" for the system used to access the Jail Activity Log. (Account Audit [Docket No. 64-1]). Here again, however, Defendants improperly based their assertion on a construction of the evidence viewed in the light most favorable to them and make inferences in their favor. See, e.g., Mirax Chem. Prods. Corp., 950 F.2d at 569; Scott v. Harris, 550 U.S. at 380. The mere fact that Defendant Nurse Pender may have had an account or "LoginID" to access the Jail Activity Log fails to support an assertion that Defendant Nurse Pender actual knew the information contained within the Jail Activity Log, given the requisite standard under which the Court must view the record presently before it.

[17] Defendants cite to deposition testimony of Defendants Benson, Savat, Bartness, White-Tuton and Defendant Hermes in support of their assertion that MEnD staff already had all pertinent information about Ms. Rudolph, in part, because staff received Pass On sheets with handwritten notes from correctional officers detailing all material medical information observed. (See, Defs.' Mem., [Docket No. 57], at 11). However, Defendant Benson did not testify that she provided any Pass On sheet information to Defendant Nurse Pender or any other medical staff. (Benson Depo, [Docket No. 58-36], at 8:6–8:17; 9:17–19; 13:7–14; 17:18–18:3). Defendant Benson only testified that that was the general policy. (Benson Depo, [Docket No. 58-36], at 8:6–8:17; 9:17–19; 13:7–14; 17:18–18:3). In fact, Defendant Benson specifically testified that she had no recollection of whether or not she provided any information to medical staff. (Benson Depo, [Docket No. 58-36], at 9:17–19; 13:7–14; 16:2–22; 17:18–18:3). Likewise, Defendant Savat did not testify that any such information was actually provided to medical staff. (Savat Depo, [Docket No. 58-33], at 32:15–33:23; 36:25–39:10). Rather, Defendant Savat only testified that it was policy for important information to be passed on to medical staff, that a team leader could call a nurse when a nurse was not at the facility, that the note from another detainee regarding Ms. Rudolph's condition could have been put into the "nurse's box," and that there was some "informal training" provided to team leaders which instructed them to pass on relevant information to the next shift and medical staff. (Savat Depo, [Docket No. 58-33], at 32:15–33:23; 36:25–39:10). However, Defendant Savat specifically testified that she was not aware if the note from the other detainee regarding Ms. Rudolph's condition was actual but in the nurse's box or if any information was given to medical staff. (Savat Depo, [Docket No. 58-33], at 32:21–33:1; 37:8–22). Similarly, Defendant Bartness did not provide any deposition testimony asserting that medical personal had been provided with all relevant information regarding Ms. Rudolph. (See, Bartness Depo, [Docket No. 58-19], at 27:6–31:25). Instead, Defendant Bartness provided deposition testimony that that she could not remember if she had any contact with medical staff at the start of her shift on November 2, 2016; if it had been indicated to medical staff that Ms. Rudolph was withdrawing from drug use; if medical staff had been informed that Ms. Rudolph had been mumbling and fidgeting; or if medical staff had been informed that Ms. Rudolph had been vomiting. (Id.). Similar contradictions exist between Defendants' citation to the deposition testimony of Defendant White-Tuton and Defendant Hermes and the actual content of

Because Defendants were in possession of relevant, medical facts of which the medical professional was not aware, Defendants cannot rely upon their argument that the condition was not obvious to a medical professional. See, McRaven v. Sanders, 577 F.3d 974, 981–82 (8th Cir. 2009). Instead, the Eighth Circuit Court of Appeals has noted in similar circumstances that a defendant's possession of relevant, medical facts when those facts are unknown by the medical professional creates disputed issues of material fact. See, Id.

On this record, a fact finder could reasonably infer that Ms. Rudolph's serious medical need was so obvious that a layperson would easily recognize the necessity for a doctor's attention. Therefore, the Court finds that Plaintiff has sufficiently demonstrated an objectively serious medical need requisite to survive summary judgment.

## 2.  Subjective Knowledge

To overcome the asserted defense of qualified immunity, Plaintiff must also demonstrate "that the defendant[s] actually knew of, but deliberately disregarded" Ms. Rudolph's serious medical need. Thompson, 730 F.3d at 746. To show that a defendant knew of but deliberately disregarded an objectively serious medical need, "the plaintiff must establish a mental state akin to criminal recklessness: disregarding a known risk to the inmate's health." Thompson, 730 F.3d at 746–47 (citation omitted). This requisite mental state may be established through circumstantial evidence, as "a factfinder may determine that a defendant was actually aware of a serious medical need but deliberately disregarded it, from the very fact that the [medical need] was obvious." Id. (quoting Vaughn v. Gray, 557 F.3d 904, 908–09 (8th Cir. 2009).

Despite Defendants assertion that Plaintiff must provide proof that each Defendant "actually knew of [Ms.] Rudolph's serious medical needs and recognized" and "appreciated" that

---

those depositions. (See, White-Tuton Depo., [Docket No. 58-34], at 14:19–14:25; 28:12–29:5; Hermes Depo., [Docket No. 58-35], at 8:6–17; 13:7–11; 17:7–18:5).

the serious medical need "created 'a substantial risk of harm' but deliberately disregarded" said serious medical need, (Defs.' Mem., [Docket No. 57], at 25),[18] Plaintiff is not, at this summary judgment stage, required to present evidence that each Defendant actually and affirmatively knew of the serious medical need, as well as, proof that each Defendant consciously made the specific inference of that serious medical need based on the facts known to that Defendant. See, e.g., Ryan v. Armstrong, 850 F.3d 419, 426 (8th Cir. 2017); Thompson, 730 F.3d at 746–47; Trujillo v. Corizon Health, Inc., No. 17-cv-1633 (PJS/ECW), 2019 WL 1409331, at *3 (D. Minn. Mar. 28, 2019). Instead, Plaintiff need only present facts upon which a reasonable factfinder could infer that each Defendant knew of the serious medical need and deliberately disregarded it. See, e.g., Ryan v. Armstrong, 850 F.3d 419, 426 (8th Cir. 2017); Thompson, 730 F.3d at 746–47; Trujillo v. Corizon Health, Inc., No. 17-cv-1633 (PJS/ECW), 2019 WL 1409331, at *3 (D. Minn. Mar. 28, 2019).

In the present case, Defendants Benson, Bartness, Hanson, Olson, Lien, and Heck each had knowledge of Ms. Rudolph's medical condition of which Defendant Nurse Pender was not aware. (See, e.g., Larson Report [Docket No. 58-14]; Bartness Report [Docket No. 58-18]; Bartness Depo., [Docket No. 58-19], at 12:20–13:7; Hanson Report, [Docket No. 76-1], at 35;

---

[18] In support of this incorrect assertion, Defendants rely upon Farmer v. Brennan, 511 U.S. 825 (1994). However, Farmer supports a finding in opposition to Defendants' assertion. The Farmer Court specifically noted that "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Id. at 842. The Supreme Court of the United States and the Eighth Circuit Court of Appeals have continued to hold that the requisite subjective knowledge can be demonstrated through circumstantial evidence, including the fact that the serious medical need was "obvious." See, e.g., Thompson, 730 F.3d at 747; Vaughn v. Gray, 557 F.3d 904, 908–09 (8th Cir. 2009). In fact, the Farmer Court remanded the issue before it to the District Court to determine the facts which could be inferred from the record. See, Farmer v. Brennan, 511 U.S. 825, 848–50 (1994). For these same reasons, Defendants' reliance on the following cases is misplaced as well: Whitney v. City of St. Louis, Missouri, 887 F.3d 857, 860 (8th Cir. 2018); Vaughn v. Greene County, 438 F.3d 845, 850 (8th Cir. 2006); Patterson v. Kelley, 902 F.3d 845, 852 (8th Cir. 2018); Lambert v. City of Dumas, 187 F.3d 931, 938 (8th Cir. 1999); Spruce v. Sargent, 149 F.3d 783, 786 (8th Cir. 1998); Gregoire v. Class, 236 F.3d 413, 418–19 (8th Cir. 2000). In fact, the Gregoire Court specifically noted that while "a plaintiff must establish that the official in question did in fact know of the risk . . . , this knowledge is subject to proof by all the usual ways, including inferences based on the obviousness of the risk." Gregoire v. Class, 236 F.3d 413, 417 (8th Cir. 2000).

Olson Report, [Docket No. 76-1], at 52; Lien Report, [Docket No. 76-1], at 53; Internal Report [Docket No. 76-1]). Specifically, Defendant Benson knew that Ms. Rudolph had soiled herself and was continually vomiting because she was "withdrawing" from using "heroin," (Larson Report [Docket No. 58-14]); Defendant Bartness and Defendant Heck knew that Ms. Rudolph was "detoxing from heroin," (Bartness Report [Docket No. 58-18]); Defendant Bartness knew that Ms. Rudolph was speaking incoherently and fidgeting, (Bartness Depo., [Docket No. 58-19], at 12:20–13:7); and Defendant Hanson observed Ms. Rudolph laying on the floor near the toilet because she was repeatedly vomiting. (Hanson Report, [Docket No. 76-1], at 35). In addition, Defendants Bartness, Heck, Olson, and Lien each, on at least one occasion, provided Ms. Rudolph with a new vomit bag after observing that Ms. Rudolph's old, used vomit bag had been filled enough with vomit that it needed to be emptied. (Bartness Report [Docket No. 58-18]; Olson Report, [Docket No. 76-1], at 52; Lien Report, [Docket No. 76-1], at 53). In total, Defendants Benson, Bartness, Hanson, Olson, Lien, and Heck observed Ms. Rudolph repeatedly vomiting on at least seven occasions. (Bartness Report [Docket No. 58-18]; Olson Report, [Docket No. 76-1], at 52; Lien Report, [Docket No. 76-1], at 53; Larson Report [Docket No. 58-14]).

On the record now before the Court, a reasonable factfinder could infer that Defendants Benson, Bartness, Hanson, Olson, Lien, and Heck were each subjectively aware of Ms. Rudolph's serious medical and deliberately disregarded it based on the obviousness of the medical need. See, Ryan v. Armstrong, 850 F.3d 419, 426 (8th Cir. 2017); Trujillo v. Corizon Health, Inc., No. 17-cv-1633 (PJS/ECW), 2019 WL 1409331, at *3 (D. Minn. Mar. 28, 2019). "[A] reasonable jury could conclude that" Ms. Rudolph's serious medical need "was so obvious

that each of the" Defendants "must have known of it." <u>See</u>, <u>Trujillo v. Corizon Health, Inc.</u>, No. 17-cv-1633 (PJS/ECW), 2019 WL 1409331, at *3 (D. Minn. Mar. 28, 2019).

Defendants also argue that Plaintiff cannot show they were deliberately indifferent because Defendants responded "reasonably" to the "risk" by arranging for Ms. Rudolph's medical care (<u>See</u>, Defs.' Mem., [Docket No. 57], at 31–34) (relying on <u>Dulany v. Carnahan</u>, 132 F.3d 1234, 1240 (8th Cir. 1997)). However, Defendants argument here is precluded for the same reasons discussed above. Defendants may not rely on the medical opinion of a medical profession when Defendants possessed relevant, medical information of which the medical professional was not aware. <u>See, e.g.</u>, <u>McRaven v. Sanders</u>, 577 F.3d 974, 981–82 (8th Cir. 2009).

Defendants further argue that Courts "hesitate to find [deliberate indifference] when a prison inmate had received medical care." (<u>See</u>, Defs.' Mem., [Docket No. 57], at 31–34) (relying on <u>Smith v. Jenkins</u>, 919 F.2d 90, 93 (8th Cir. 1990)).  Defendants reliance on <u>Smith v. Jenkins</u>, 919 F.2d 90, 93 (8th Cir. 1990), for the assertion that Courts "hesitate to find [deliberate indifference] when a prison inmate has received medical care," is misplaced because the holding of <u>Jenkins</u> contradicts Defendants' argument.

The <u>Jenkins</u> Court after noting this hesitation found that even though the plaintiff had received medical care "the district court erred as a matter of law in ruling that mere proof of medical care by a doctor consisting of diagnosis only sufficed to disprove deliberate indifference." <u>Id.</u> In the present case, Defendants may not rely on the mere proof of medical care to assert that it is an impossibility that they be found to have deliberately disregarded any serious medical need, especially when, as discussed above, Defendants possessed relevant, medical facts

of which the medical profession upon which they rely was not aware. See, Id.; McRaven v. Sanders, 577 F.3d 974, 981–82 (8th Cir. 2009).

Lastly, Defendants argue that because Plaintiff's deliberate indifference claim is brought under provisions of a substantive due process claim, Plaintiff must also demonstrate that Defendants' conduct shocks the conscience. (See, Defs.' Mem., [Docket No. 57], at 35–39). The Court finds this argument to be unpersuasive.

While certain substantive due process claims require a plaintiff to demonstrate that the offending conduct "was conscience-shocking" Hall v. Ramsey Cty., 801 F.3d 912, 917 (8th Cir. 2015), this separate requirement of showing that the conduct shocks the conscience does not apply to claims arising under the Fourteenth Amendment which assert a deliberate indifference to a serious medical need. Each of the cases to which Defendants cite is inapposite because while the cases do address substantive due process claim—with the exception of Hall—they do not address deliberate indifference to a serious medical need claims brought under the Fourteenth Amendment's Due Process Clause. These cases simply do not address a claim similar to Plaintiff's claim and Defendants have failed to proffer any argument as to why these cases should be applied to the present case even though they address claims not at issue in the present case.

While Hall does address a deliberate indifference claim, Id., Defendants do not cite to the portion of the opinion addressing the deliberate indifference claim. (See, Defs.' Mem., [Docket No. 57], at 35–39). In fact, the portion of Hall which does address a deliberate indifference claim contravenes Defendants' argument here because the Hall Court's discussion of the deliberate indifference claim in that case is devoid of any mention of conscience-shocking standard. Hall, 801 F.3d at 920. Instead, the Hall Court specifically noted that although the deliberate

46

indifference claim arises under the Fourteenth Amendment's Due Process Clause, the Court applies the indifference standard governing claims brought under the Eighth Amendment.[19]

Therefore, on the record now before the Court, when viewed in the light most favorable to Plaintiff and drawing all reasonable inferences thereon in Plaintiff's favor, the Court finds that Plaintiff has demonstrate a genuine dispute of material fact regarding whether or not Defendants had subjective knowledge of Ms. Rudolph's serious medical risk.

### 2. Clearly Established Right

As observed above, to overcome the defense of qualified immunity, a plaintiff must show that the constitutional right at issue was clearly established at the time of the alleged deprivation. See, Parrish v. Ball, 594 F.3d 993, 1001 (8th Cir. 2010). It is well established that a pretrial detainee has a constitutional right to adequate medical care, and further, that right was clearly established at the time of the alleged constitutional violations in the present case. See, e.g., Dadd v. Anoka Cty., 827 F.3d 749, 756 (8th Cir. 2016) (citing West v. Atkins, 487 U.S. 42, 55 (1988)).

Defendants argue that Plaintiff has failed to demonstrate a clearly established right because "Plaintiff claims [Ms.] Rudolph had a right to specific medical treatment in response to an **unknown** medical risk," (Defs.' Mem., [Docket No. 57], at 40) (emphasis in original), and such a right has never been clearly established. The Court finds this argument to be unpersuasive because this argument is based on a misconstruction of Plaintiff's claim here.

First, Plaintiff does not argue that Ms. Rudolph had a constitutional right to <u>specific</u> medical care. Rather, Plaintiff asserts that Ms. Rudolph had a constitutional right to <u>adequate</u>

---

[19] Throughout their memorandum, Defendants also cite to several cases which involve deliberate indifference claims raised in response to law enforcement officers' conduct during the pursuit of a fleeing suspect, including "high speed" car chases. (See, e.g., Def.'s Mem., [Docket No. 57], at 35) (citing County of Sacramento v. Lewis, 523 U.S. 833 (1998)). In this high-speed pursuit cases, Courts apply the higher "intent to harm" standard, and some Courts discusses the conscience-shocking standard as well. See, County of Sacramento v. Lewis, 523 U.S. 833 (1998). In any event, those cases are likewise inapposite as the present case does not involve the pursuit of any fleeing suspect.

medical care. (See, Amended Compl., [Docket No. 2], at 21–24). Plaintiff argues that Defendants failure to provide the relevant, medical information to medical staff rendered inadequate the limited medical care provided to Ms. Rudolph. Second, Plaintiff does not allege that Ms. Rudolph was entitled to medical treatment to in response to an unknown medical risk of the type asserted by Defendants, e.g., a medical risk which is completely unknown and cannot be inferred from patent observations. Instead, Plaintiff alleges that Ms. Rudolph had a constitutional right to adequate medical care based on the information regarding the medical symptoms of Ms. Rudolph that were readily known to Defendants.

Defendants also argue that for Plaintiff to establish that a right was clearly established Plaintiff must demonstrate that the right was established at a highly specific level, and Plaintiff must identify a case where an official was found to have violated the same, specific right under the same specific facts of the present case. (See, Defs.' Mem., [Docket No. 57], at 40; September 9, 2020, Motions Hearing, Digital Record at 2:42 p.m.–2:46 p.m.; 2:56 p.m.–3:00 p.m.). The law is not so harsh as Defendants contend. For the reasons discussed herein, the Court finds unpersuasive Defendants argument here.

Notably, each of the cases relied upon by Defendants in support of the present argument is inapposite to the present case. (See, Defs.' Mem., [Docket No. 57], at 40) (citing White v. Pauly, 137 S.Ct. 548 (2017); Kisela v. Hughes, 138 S.Ct. 1148 (2018); County & City of San Francisco, California v. Sheehan, 135 S.Ct. 1765 (2015)). Each of these cases involved an alleged excessive force violation of plaintiff's Fourth Amendment rights. See, White v. Pauly, 137 S.Ct. 548 (2017); Kiesla v. Hughes, 138 S.Ct. 1148 (2018); County & City of San Francisco, California v. Sheehan, 135 S.Ct. 1765 (2015). There is no such violation alleged here.

Both White and Kisela provide that a plaintiff alleging a violation of his or her Fourth Amendment right based on an allegation of excessive force must demonstrate that the asserted right was clearly established with a greater level of specificity. See, White v. Pauly, 137 S.Ct. 548 552 (2017); Kisela v. Hughes, 138 S.Ct. 1148, 1152 (2018)0. However, this requisite level of specificity is not required to demonstrate the clear establishment of a right to adequate medical care under the Eighth and Fourteenth Amendments. See, gen., White v. Pauly, 137 S.Ct. 548 (2017); Kisela v. Hughes, 138 S.Ct. 1148 (2018). In fact, White, upon which the Defendants appear to heavily rely, does not appear to have ever been cited by either the Eighth Circuit Court of Appeals or the Supreme Court of the United States for the proposition that a plaintiff must establish a due process right (such as the right to adequate medical care under the Fourteenth Amendment) or an Eighth Amendment right at the same level of specificity as a plaintiff must establish a right to be free from the use of excessive force under the Fourth Amendment.

Cases alleging a violation of the Fourteenth Amendment and cases alleging a deliberate indifference to a serious medical need through the denial of adequate medical care, such as the present case, are "not . . . like many Fourth Amendment cases, where the specificity of the rule is especially important because officers will often find it difficult to know how the Constitution applies in the precise situation encountered." Dean v. Searcey, 983 F.3d 504, 519 (8th Cir. 2009) cert. denied. 2019 WL 1005858, 139 S.Ct. 1291 (2019); see, District of Columbia v. Wesby, 138 S.Ct. 577, 590 (2018) ("We have stressed that the 'specificity' of the rule is 'especially important in the Fourth Amendment context.'") (emphasis added); McRaven v. Sanders, 577 F.3d 974, 981–82 (8th Cir. 2009) (defining a pretrial detainee plaintiff's clearly established right simply as "[a] detainee's right to medical treatment"). Fourteenth Amendment due process claims generally require a less context specific analysis than Fourth Amendment claims, and therefore, a

plaintiff is permitted to demonstrate a clearly established right at a less specific level than is required to demonstrate the clear establishment of a Fourth Amendment right. See, McRaven v. Sanders, 577 F.3d 974, 981–82 (8th Cir. 2009) (defining a pretrial detainee plaintiff's clearly established right simply as "[a] detainee's right to medical treatment"); Winslow v. Smith, 696 F.3d 716, 738–39 (8th Cir. 2012) (concluding that "[p]ursuant to Wilson [v. Lawrence County, 260 F.3d 946, 956 n.8 (8th Cir. 2001)], a due process right against a reckless investigation" was clearly established at that level of generality even though Wilson only established a generalized right it described as "the interest in obtaining a fair criminal proceeding before being denied one's liberty").

In the present case, Plaintiff's claim proceeds under the Fourteenth Amendment to the United States Constitution. Defendants have failed to identify any controlling or persuasive precedent which would obligate this Court to require Plaintiff to demonstrate that Ms. Rudolph's right to adequate medical care was clearly established at the same level of specificity as a plaintiff attempting to demonstrate the clear establishment of a constitutional right to be free from excessive force pursuant to the Fourth Amendment.[20]

For these reasons it is not necessary to have a prior case "directly on point," however, "existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft v. al–Kidd, 563 U.S. 731, 741, (2011) (citation omitted); see, Johnson v. Carroll, 658 F.3d 819, 828 (8th Cir. 2011) ("Although earlier cases need not involve fundamentally or materially similar facts, the earlier cases must give officials fair warning that their alleged treatment of the plaintiff was unconstitutional."). "There is no requirement that the very action in

---

[20] As the Supreme Court of the United States has explained certain cases will present such an "obvious case" that the "unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." District of Columbia v. Wesby, 138 S.Ct. 577, 590 (2018). Viewing the evidence in the light most favorable to Plaintiff and make all reasonable inferences thereon in Plaintiff's favor, the circumstances of the present case present just such an "obvious case."

question has previously been held unlawful, but rather, in light of pre-existing law the unlawfulness must be apparent." Vaughn v. Ruoff, 253 F.3d 1124, 1129 (8th Cir. 2001).

As observed above, at the time of the incident at issue in the present case it was "clear that a pretrial detainee ha[d] a constitutional right to adequate medical care while in custody." Dadd v. Anoka Cty., 827 F.3d 749, 756 (8th Cir. 2016) (citing West v. Atkins, 487 U.S. 42, 55 (1988)); Ryan v. Armstrong, 850 F.3d 419, 426 (8th Cir. 2017). Similarly, it was clearly established at the time of the circumstances of the present case that prison official could rely on a medical professional's opinion only when that reliance was reasonable, i.e., only when the prison official was not in possession of relevant, medical information of which the medical professional had been denied. See, e.g., McRaven v. Sanders, 577 F.3d 974, 981–82 (8th Cir. 2009). The overwhelming weight of the authority regarding pretrial detainees' constitutional right to adequate medical care is sufficient to put Defendants on notice of said right, and the weight of that authority is likewise sufficient to clearly prohibit Defendants conduct here as alleged when viewed in the light most favorable to Plaintiff. Thus, the contours of the right Plaintiff alleges Defendants violated were sufficiently clear given the consensus of legal authority that a reasonable officer in Defendants position would know their actions violated Ms. Rudolph's constitutional right to adequate medical care as secured by the Fourteenth Amendment to the United States Constitution.

Therefore, the Court finds that Plaintiff has sufficiently demonstrated that Ms. Rudolph's constitutional right at issue was clearly established at the time of Defendants' alleged actions in the present case.

**IV.    Conclusion**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT**:

1.     Defendants' Motion to Exclude Testimony by Plaintiff's Experts Mark Willenbring, Kathryn Wild, and Mary Sens, [Docket No. 68], is **DENIED**;

2.     The expert testimony of Kathryn J. Wild, RN, MPA, CCHP-RN, shall be limited to only those opinions which were disclosed in the original, May 8, 2019, Affidavit; and

3.     Defendants shall have twenty-one (21) days from the date of this Order to retain responsive experts, if they so choose, and to serve appropriate disclosures on Plaintiff as required by the Federal Rules of Civil Procedure and the operative Pretrial Scheduling Order in this case.

Further, based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT**:

1.    Defendants' Motion for Summary Judgment, [Docket No. 55], be **GRANTED in part and DENIED in part**, as set forth above;[21]

2.    Defendant Savat be **DISMISSED** from the present action;

3.    Defendant Rood be **DISMISSED** from the present action;

4.    Defendant Magnuson be **DISMISSED** from the present action;

5.    Defendant Nelson be **DISMISSED** from the present action;

6.    Defendant Blum be **DISMISSED** from the present action;

---

[21] This recommendation leaves remaining in the present case Count I and Count II as alleged against Defendants Benson, Bartness, Hanson, Olson, Lien, and Heck.

7.  Defendant Livingood be **DISMISSED** from the present action;

8.  Defendant Johnson be **DISMISSED** from the present action;

9.  Defendant Hermes be **DISMISSED** from the present action;

10. Defendant Stetz be **DISMISSED** from the present action;

11. Defendant Then be **DISMISSED** from the present action;

12. Defendant White-Tutton be **DISMISSED** from the present action;

13. Defendant Torkelson be **DISMISSED** from the present action;

14. Defendant Roberts be **DISMISSED** from the present action;

15. Defendant Larson be **DISMISSED** from the present action; and

16. Defendant Clay County, Minnesota be **DISMISSED** from the present action.

Dated: September 28, 2020                       s/Leo I. Brisbois
                                                Hon. Leo I. Brisbois
                                                United States Magistrate Judge

**N O T I C E**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]" A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).